**STOLL v. HAWKEYE CAS. CO. OF DES MOINES, IOWA.**

No. 14384.

United States Court of Appeals Eighth Circuit.

Jan. 9, 1952.

See also, 185 F.2d 96.

H. L. Fuller, Sioux Falls, S. D. (C. L. Morgan, H. T. Fuller, Mitchell, S. D., M. T. Woods, J. B. Shultz, T. M. Bailey, Jr.,

and F. M. Smith, all of Sioux Falls, S. D., on the brief), for appellant.

Gale B. Braithwaite, Sioux Falls, S. D. (M. Q. Sharpe, Kennebec, S. D., and Joe W. Cadwell, Sioux Falls, S. D., on the brief), for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

Joyce Stoll, who will be referred to as the plaintiff, was injured on September 19, 1947, in Chamberlain, South Dakota, when a pickup motor truck driven by Emil Wagaman, and owned by Walter Manhalter, tipped over while she, at the invitation of Wagaman, was riding on a running board of the truck.

She sued both the owner and the driver of the truck for damages in a State court of South Dakota. She obtained a judgment only against Wagaman, the driver, which was later affirmed by the Supreme Court of South Dakota. Stoll v. Wagaman, 40 N.W.2d 393. The State trial court directed a verdict in favor of Manhalter, the owner. The plaintiff did not appeal from the judgment in Manhalter's favor.

After her judgment against Wagaman became final, the plaintiff garnished the Hawkeye Casualty Company of Des Moines, Iowa, the liability insurer of Manhalter, in the State court action, asserting that under the "omnibus clause" of its policy covering the truck, the Company was indebted to Wagaman, as an insured, in the amount of her judgment against him. The clause reads as follows: "The unqualified word 'insured' wherever used in coverages A and B and in other parts of this policy when applicable to such coverages includes the named insured and, except where specifically stated to the contrary, also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is with the permission of the named insured."

The Company removed the garnishment action to the federal court on the grounds of diversity of citizenship and amount in controversy. It denied that it was indebted to Wagaman. The issue of the policy liability of the Company to him was tried to a jury. At the close of the evidence, the plaintiff moved for a directed verdict upon the ground that the evidence conclusively showed that at the time of the accident the "actual use" of the truck by Wagaman was with the permission of Manhalter, "the named insured." The motion was denied.

The Company moved for a directed verdict on the ground that the evidence established as a matter of law that the "actual use" of the truck by Wagaman was without permission from Manhalter, and that the State court judgment in Manhalter's favor was res judicata of that issue. The District Court directed a verdict for the Company, and this appeal followed.

The first witness called by the plaintiff at the trial was Emil Wagaman, the driver of the truck (who in 1947 was twenty-five years old). He testified that he went to the home of Mr. and Mrs. Davis on Main Street in Chamberlain, South Dakota, at about 6:30 p. m. on September 19, 1947; that the Davis house is on the west side of the street and about three or four blocks south of the business section of the town; that his cousins Jimmy Wagaman (fifteen years of age in 1947) and Walter Manhalter were there with Mr. and Mrs. Davis and others; and that he (Emil Wagaman) knew that Walter Manhalter's pickup truck was at the Davis home. He then testified as follows:

" * * * After I had visited there sometime there was conversation about cigarettes. Everybody was out and I offered to go and get some. I was out of cigarettes too and wanted some. I asked Walter Manhalter for the keys to the truck. He said the keys were in the truck. Then I started out for the truck and my cousin Jimmy went with me, and we got in the truck.

\* \* \* \* \* \*

"We drove towards the Stoll residence south from the Davis house, which is about a block and a half. We stopped along there having seen Joyce Stoll and Elaine Zeman and talked with them. I asked them where

they were going and what they were doing and they said they were going in and change clothes and then go to a show or eat. I turned around and went towards town. The girls were not with us, I imagine they went in the Stoll house. Then I think we went downtown, but don't remember whether we drove all of the way down there or turned around again or what. At any rate we went on north of the Davis house and turned around and came back south again. We were up north probably five or ten minutes, and drove south past the Davis house. I saw the girls then and drove up to them when they were about half way between the Davis house and the Stoll residence, or about three quarters of a block south of the Davis house and stopped there. I invited them for a ride and they got on the running board on either side of the truck and we drove toward the sanitarium south again, which was three or four blocks on south of the Stoll house. The sanitarium is about as far as you can go [on Main Street]. We were going to turn around there and come back and planned to take the girls downtown. As I approached and entered the sanitarium grounds, the pickup tipped over there and Joyce Stoll was injured, which was the injury involved in the law suit at Chamberlain for which she got judgment."

On cross-examination, Emil Wagaman testified:

" * * * It is about three blocks from the entrance to the sanitarium to the sanitarium building itself. I went on down through the sanitarium grounds past the building before I upset. It would be five or six blocks north from the sanitarium corner to the place where we picked the girls up.

"I volunteered to go and get cigarettes and that is what I got the pickup for. Instead of going north to town to get cigarettes, I went south when I first saw Joyce and Elaine. Then we went north, I don't know exactly where we went. * * * I don't believe we got any cigarettes. Then we turned around to go back to the girls again. I didn't stop to give the cigarettes to anyone.

"Just six days after accident happened, I made a written statement in which I said: 'We were all sitting inside of the Davis home when I discovered I didn't have any cigarettes. I asked Walter if I could take his pickup and go get some cigarettes. This 1946 Chevrolet pickup is the only one Walter owned. I asked Walter if I could take his pickup. Walter said go ahead. I asked him for the keys and he said the keys were in the pickup.' "

On redirect examination, Emil Wagaman testified that it was not more than six blocks from the Davis house to the sanitarium, and the distance to town from the house was a few blocks, "so the area in which I was operating this truck extended simply for a few blocks in either direction from the Davis home."

At the conclusion of the testimony of Emil Wagaman, the plaintiff rested. The Company then moved for a directed verdict in its favor on the ground that the actual use being made by Wagaman of the truck at the time of the accident was not only a substantial deviation but a complete departure from any purpose for which he was permitted to use the truck, and that the jury could not find otherwise. The court reserved its ruling on the motion, and the Company put in its evidence. Its witnesses were Walter Manhalter and Jimmy Wagaman. Their testimony did not differ materially from that given by Emil Wagaman with respect to the permission granted him to use the truck after he had volunteered to get cigarettes.

A portion of Manhalter's testimony, on cross-examination, is as follows: "When I told him the keys were in the truck I thought he was going downtown for cigarettes. That is what he said but I didn't know where he was going. I do not remember any conversation in the first part of October following this accident in September at the city hall in Chamberlain in which Howard Stoll was present also Mr. Haley, the Sheriff, in which I was asked the question 'Did Wagaman have permission to drive the truck' and to which I made answer, 'Sure he had permission to drive

the truck. All of my friends can use my cars when they want to.' "

Manhalter also testified that he did not see Emil and Jimmy when they drove away, and did not see the girls at that time; that about ten or fifteen minutes after the boys left, he saw the truck again; that he was then on the front porch of the Davis home, and, as they drove in front of the house going south down the street, he hollered: "Hey, where are you going with that pick-up? Bring it back." He also testified that he saw the truck stop about two blocks south after it passed the Davis house, and saw the girls get in the truck and the truck go on south; that he never told Emil or Jimmy that it would be all right for them to pick up the girls; and that he had a date and intended to use the truck later that evening.

Jimmy Wagaman corroborated Manhalter's testimony. Jimmy testified that, as he and Emil passed the Davis house on the way to pick up the girls, he heard Manhalter call out: "Stop. Where are you going with that pickup? Bring it back." Jimmy also testified that he did not say anything to Emil about it. Jimmy's account of the route of the truck prior to the accident did not differ materially from that of Emil Wagaman.

The Company, over the objection of the plaintiff, introduced in evidence so much of the record of the action in the State court in the case of Joyce Stoll against Wagaman and Manhalter as tended to indicate that the issue whether Wagaman was using the truck with the permission of Manhalter had been involved in that action; this upon the theory that the judgment in favor of Manhalter in that case barred the plaintiff from claiming that the Company was liable to Wagaman under its policy.

In rebuttal, Joyce Stoll testified that she was in the vicinity of the Davis house until she got on the truck and that she did not hear Walter Manhalter yell.

Howard Stoll, the father of the plaintiff, testified that in the forepart of October, 1947, he asked Manhalter whether Emil Wagaman had permission to drive the truck, and that Manhalter said: "Sure he had permission to drive the truck. Any friend of mine can drive my car any time he wants to." This was objected to on the ground that it did not tend to negative Manhalter's testimony to the effect that he gave no permission to use the truck at the time and place of the accident. The court overruled the objection, and admitted the evidence but only for the purpose of impeachment. Virgil Haley, the Sheriff of Brule County, South Dakota, testified that he heard Manhalter make the statement above quoted. The record shows no objection to Haley's testimony.

At the close of the evidence, the plaintiff moved to strike from the record the State court judgment and other evidence relating to the issue of res judicata. The court denied the motion.

In denying the plaintiff's motion for a directed verdict and granting that of the Company, the court first said to counsel: "Gentlemen, I don't think it would be any kindness to the plaintiff in this action to refuse to sustain the defendant's motion, because if I should do so, she would be subjected to the costs of an appeal and that the Court of Appeals would sustain this Court. I can't see my way clear to do anything but grant the motion on the part of the insurance company."

The court then said to the jury: "Ladies and Gentlemen of the Jury: As I indicated to you when we left the room, there was certain questions of law to be presented and argued to the Court involving this litigation, and as a result of the motion and the argument made thereon the Court has come to the conclusion that the only thing the Court can do is to direct the verdict in favor of the garnishee defendant in this case."

So far as the record shows, the District Judge did not state what he considered to be the applicable law of South Dakota or what his reasons were for his conclusion that the Company was entitled to judgment as a matter of South Dakota law.

Since the court refused to strike the evidence relating to the issue of res judicata, it is reasonable to assume that the basis for the directed verdict was the belief that the plaintiff was estopped by the State court judgment from contending that Emil Wag-

aman was driving the truck with Manhalter's permission.

We think that the State court judgment was not res judicata of the policy liability of the Company to Wagaman. It is not contended that a mere grant of permission to use an automobile makes the owner liable for the negligence of the permittee or bailee, under South Dakota law. We find no South Dakota statute imposing any such liability upon owners of automobiles. The question raised in the plaintiff's action in the State court against Manhalter was not whether the use of his truck by Wagaman was with permission of Manhalter within the meaning of the omnibus clause of the policy here in suit, but whether, under the evidence in that case, Wagaman's negligence could be imputed to Manhalter upon the theory that, in driving the truck, Wagaman was acting for or on behalf of Manhalter. We think that all that the State court could have decided was that the plaintiff's evidence failed to make a case of common-law liability against Manhalter for Wagaman's negligence. See Vezolles v. Home Indemnity Co., D.C.W.D. Ky., 38 F.Supp. 455, 456, affirmed per curiam, 6 Cir., 128 F.2d 257. The case of Harding v. Carr, R.I., 83 A.2d 79, cited by the Company, is clearly distinguishable from the instant case when read in connection with Chase v. United States Fidelity & Guaranty Co., 73 R.I. 51, 53 A.2d 708.

It is our opinion that the record of the proceedings in the State court was incompetent, should not have been admitted in evidence, and should have been stricken; and that the directed verdict in favor of the Company, based in whole or in part upon that record, is erroneous.

The Company asserts that the judgment should be affirmed upon the ground that it reflects the considered views of the District Court upon a doubtful question of South Dakota law. The question of res judicata we do not regard as doubtful. Since the District Judge did not state his views of the South Dakota law applicable to the facts as disclosed by the competent evidence in the case, we have no knowledge as to what those views were.

There is great diversity of opinion as to whether the permission initially granted by an automobile owner to another to use an automobile for an announced purpose makes the bailee or permittee an insured under an automobile liability policy containing an omnibus clause, if he uses the car for a different purpose. Some courts hold in effect, that any departure from the contemplated purpose for which permission was granted relieves the insurer from liability to the bailee. Other courts are of the view that a departure from the purpose contemplated does not relieve the insurer. Distinctions are made based upon whether deviations in time, route or purpose are considered slight or substantial. Whether the bailee is a friend or relative and the use is for a social as distinguished from a business purpose has been thought to have significance in determining the scope of the permission granted. See Jordan v. Shelby Mutual Plate Glass & Casualty Co., 4 Cir., 142 F.2d 52, 56. Cases dealing with this general subject are collected and classified in the annotations to State Farm Mutual Automobile Insurance Co. v. Cook, 186 Va. 658, 43 S.E.2d 863, 5 A.L.R.2d 594, 600 et seq. We think it unnecessary, in this opinion, to attempt a re-analysis or reclassification of the authorities.

The Supreme Court of South Dakota has not as yet decided a case which bears any similarity to the instant case. So far as we are aware, there is no "available data", West v. American Telephone & Telegraph Co., 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139, for determining what the applicable law of that State is. There is, however, no reason to anticipate that the attitude of the Supreme Court of South Dakota toward the coverage of an insured under the omnibus clause of a liability policy would be any more favorable to the insurer than that, for instance, of the Supreme Court of Minnesota. We note that that court has apparently adopted a more liberal view of the coverage of the omnibus clause than that which is contended for by the Company in the instant case. See Peterson v. Maloney, 181 Minn. 437, 440–442, 232 N.W. 790, and compare Persellin v. State Auto-

mobile Insurance Association, 75 N.D. 716, 718–722, 32 N.W.2d 644, 646–648.

 Permission to use an automobile may, of course, be either express or implied. Traders & General Insurance Co. v. Powell, 8 Cir., 177 F.2d 660, 666–667. Implied permission is actual permission circumstantially proved. Even though express permission be limited, circumstances may justify an inference that the scope of the actual permission granted was broader than that which was expressed.

Emil Wagaman, as the record shows, was a relative and friend of Walter Manhalter. Wagaman asked for the use of the pickup truck. He had stated that he would go for cigarettes. He was given permission to use the truck. He and his cousin, also a close relative of Manhalter, drove off in it, but used it for another purpose. We think that this change in purpose would not have precluded the jury from finding that the permission granted was not limited solely to the use of the truck to procure cigarettes, and that the jury could have found that the actual use made of the truck was with Manhalter's permission within the meaning of the omnibus clause. We do not say that the circumstances shown by the evidence would compel such a finding. We think the plaintiff was not entitled to a directed verdict, and that the jury could have returned a verdict for the Company.

 It is to be noted that virtually all the witnesses in the case were either related or had some interest in its outcome. Their credibility and the weight of their evidence were for the jury. See Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 440–443; Hoyt v. Clancey, 8 Cir., 180 F.2d 152, 155. Viewing the evidence, as we must, in the light most favorable to the plaintiff and giving her the benefit of all inferences which reasonably can be drawn in her favor, it is our conclusion that the question whether the actual use of the truck, at the time of the accident, was within the scope of the permission granted to Wagaman by Manhalter, was a question of fact for the jury, and not a question of law for the court.

The judgment appealed from is reversed, and the case is remanded for a new trial in conformity with this opinion.