Verna M. KEMP et al., Respondents,

v.

**MFA MUTUAL INSURANCE COMPANY,**
**Appellant.**

No. 25165.

Kansas City Court of Appeals,
Missouri.

June 10, 1971.

Howard F. Major, Hamp Ford and Ronald A. Graves, Columbia, for appellant.

Terence C. Porter, of Welliver, Porter & Cleaveland, Columbia, for respondent American Ins. Co.

Carl F. Sapp, of Sapp, Woods, Dannov & Orr, Columbia, for respondent, Verna M. Kemp.

HOWARD, Judge.

This case comes to the writer on reassignment. It is an appeal from the judgment of the circuit court in an equitable garnishment action brought by Verna M. Kemp under Section 379.200, RSMo 1969, V.A.M.S., against The American Insurance Company, MFA Mutual Insurance Company and Ralph Bruner. The action is to enforce and collect a judgment of $10,000.-00 which Kemp obtained against Bruner because of personal injuries suffered by Kemp when she was involved in a collision between an automobile operated by her and a 1957 Pontiac owned by R. R. Suggett and driven by Bruner, upon which MFA had issued its liability insurance policy.

The judgment is to the effect that the liability coverage under the policy issued to Suggett by MFA up to maximum limits therein provided ($25,000.00), is the primary coverage for the 1957 Pontiac automobile with respect to the judgment in this case; that the liability coverage under a policy issued by American to Bruner on his owned automobile (with limited coverage while operating a non-owned automobile) was and is excess coverage available to be applied on this judgment only after coverage under the MFA policy has been exhausted; that the plaintiff, Kemp, the holder of a judgment for $10,000.00 against Bruner, have and recover from MFA the full amount of said judgment, with interest thereon at 6% per annum from March 19, 1966, together with costs; and that Bruner and American be discharged at the cost of MFA.

Briefly summarized, the evidence shows that at Suggett's request Bruner took the Suggett automobile to the filling station where he was employed for the purposes of repairing it. At noon Bruner drove into Fulton and had lunch at Cecil's cafe, where his wife was employed, as was his regular custom. On returning from lunch the collision with the Kemp automobile occurred as Bruner was preparing to turn into the filling station where he was employed.

The so-called omnibus clause of the MFA insurance policy provided that as to the Suggett automobile, the term "insured" included any person using the automobile with the permission of the named insured providing his actual operation was within the scope of such permission. Plaintiff contends that Bruner was operating with Suggett's permission and was thus an additional insured under the above provision of the policy. MFA contests this contention and maintains that Bruner did not have permission to operate the automobile during the noon hour. This question of permission is the only issue present on this appeal.

In view of this issue a rather detailed statement of the evidence is required. Both Bruner (the driver) and Suggett (the owner) testified in the equitable garnishment proceeding. Also, a transcript of the testimony of both Bruner and Suggett at the trial of the negligence case was introduced in the garnishment proceeding. Furthermore, the depositions of both Bruner and Suggett taken in preparation for the trial of the negligence case were introduced in the garnishment proceeding. Thus, we have the testimony of the owner and the driver given on three different and distinct occasions.

Bruner had worked for Mr. Suggett off and on for more than twenty years. Mr. Suggett operated a 500 acre farm devoted mainly to hay and the feeding of cattle. Bruner and hs wife lived on a 10 acre tract which adjoined Suggett's farm and the two farm houses were about one-fourth mile apart. At the time in question, Bruner worked full-time at the MFA service station and was paid by the week. This station was located a short distance outside the town of Fulton, Missouri. About every other night, Bruner worked an hour for Suggett after he got off work from the service station, helping to feed cattle and

do chores on the Suggett farm. Bruner would frequently go to the Suggett house to see if there was anything that Suggett or his wife needed and frequently Suggett would contact Bruner to bring supplies, etc., from town to the Suggett farm or to come to the Suggett farm to work.

On occasions in the past when Bruner worked all day for Suggett and did not have his truck with him, Suggett would permit Bruner to drive the Suggett car to Bruner's home for lunch and return. Bruner drove the tractors, machinery and equipment around the Suggett farm as needed without specific directions or permission. He had driven just about every vehicle Suggett had owned over the years. He had driven this and other automobiles to get parts when farm machinery needed repairs without specific permission or instruction and on occasion took his wife with him on these trips.

It appears that in the fairly recent past, Bruner had worked at a Skelly oil station in Fulton and had, on at least several occasions, driven Suggett's car to that station to be repaired. The Skelly station was located in downtown Fulton, close to Cecil's cafe where Mrs. Bruner worked and Mr. Bruner walked there for lunch and had no reason to drive.

Mrs. Bruner had on occasion helped around the Suggett house (Mr. Suggett was 81 years old and his wife was elderly) and she worked regularly in Cecil's cafe in Fulton, Missouri. It appears that Mr. Bruner regularly ate lunch at Cecil's cafe and also washed dishes at the cafe during the noon hour even when he had regular employment at the filling station. While Mr. Suggett denied knowing whether Mr. Bruner ate lunch and if so, where he ate lunch, he admitted that he knew that Bruner was regularly at Cecil's cafe during the noon hour and he frequently called Bruner at Cecil's cafe to ask him to bring things to the Suggett farm with him when he came home or asked him to come to the farm to work. As a matter of fact, the present course of events began when he

called Bruner at Cecil's cafe and asked him to come to the Suggett home after work because Suggett's car would not start. Bruner did so and got the car started and was then instructed to take it to the filling station the next morning for repairs.

Bruner regularly drove his truck to the MFA station and Mrs. Bruner drove their car to her work at Cecil's cafe. On this occasion, Bruner did not have his truck because he drove Suggett's automobile to work. The distance between the MFA filling station and Cecil's cafe was about two and a half miles. This was too far for Bruner to be expected to walk to Cecil's cafe for lunch and to wash dishes and return within a one hour lunch period. This was known to Suggett.

It must be remembered that the statement of Mr. Suggett was very brief and general. He simply told Bruner to take his car home with him on Friday night so that Bruner could get an early start on Saturday morning; to take the car with him on Saturday morning when he went to work at the MFA service station, repair the car and return the car to Suggett when Bruner came home from work at the service station Saturday evening. That was all that was said. There was no direction as to the route to be taken. There was no express limitation on the operation of the vehicle. The matter of Bruner's eating lunch or going to Cecil's cafe at noon was not mentioned or discussed. All that was said was: Take my car to the service station, fix it and bring it back when you come home from work.

It is thus apparent that there was no express permission from Suggett to Bruner authorizing Bruner to drive the car to Cecil's cafe at noon. The issue comes down to this: Can such permission be implied under all of the circumstances? The cases relied on by appellant to support its contention that there was no permission given to Bruner to use the Suggett vehicle at the time of the collision are all distinguishable. Thus, in McKee v. Travelers Insurance Company, Mo.App., 315 S.W.2d 852, a reg-

ular employee was permitted to take the company truck home with him at night and return it to work in the morning for the mutual convenience of the employer and employee in securing the employee's early arrival at work. The employee was specifically prohibited from using the truck for his own purposes. He did so and was involved in a wreck. Such personal use was held to be without permission under the omnibus clause of the employer's insurance policy because such use was in violation of the express prohibition.

In Straughan v. Asher, Mo.App., 372 S.W.2d 489, the issue was whether or not the owner of the vehicle gave her son specific permission to use the automobile. The court found that the only evidence properly admissible in the case was subject to two opposing inferences and, therefore, concluded that the plaintiff did not carry his burden of proof to show permission. In Varble v. Stanley, Mo.App., 306 S.W.2d 662, the seventeen year old son took his mother's car without the knowledge of either parent and had a wreck before he returned. Since the entire possession and operation was without the knowledge of the owner, the court found that it could not be with the permission of the owner. In the case at bar, Bruner had initial permission to operate the Suggett car and the question is as to the scope of such permission.

In Hanover Insurance Company v. Abchal, Mo.App., 375 S.W.2d 605, the owner placed his car on a used car lot for sale; it was operated by a salesman for the salesman's personal convenience and a wreck ensued. No specific permission had been given for such operation. Plaintiff attempted to show that it was the custom that salesmen would operate cars left on the lot for sale, for their own personal use. The owner testified that such use would have been agreeable with him if he had known about it. The court found that such acquiescence after the fact did not establish permission to use the car at the time of the accident.

The foregoing cases are all so factually different from the case at bar and the legal issues decided therein are so different from the issue presented in the case at bar that they are neither controlling or persuasive. The same is true of Travelers Insurance Company v. Kinney (D.C.E.D., Mo.), 238 F.Supp. 652, wherein the driver returned the car as specifically instructed and when he found that the owner was gone, continued to operate the car and was involved in a wreck. In the case at bar, Bruner was not supposed to return the car until that evening and the accident happened about 1:00 p. m.

The other authority relied upon by appellant is the case of Speidel v. Kellum, Mo.App., 340 S.W.2d 200, decided by this court in 1960. In this case the operator of the vehicle was an employee of a grocery store. The manager sent the employee to get the manager's personal automobile from a garage where it was being repaired. He was instructed to bring the car back to the store and was told to hurry back because it was Friday, their busy day. Instead of returning directly to the store the employee drove west from the garage a few blocks, then south about thirty blocks, then east and apparently passed within a block of the store and went thirty-two blocks (about two and a half miles) on east of the store where the wreck occurred. The court there relied upon McKee v. Travelers Insurance Company, supra, and in consideration of the various tests of liability set out in the annotation at 5 A.L.R.2d 600, adopted what is called the "minor deviation rule." This rule, roughly paraphrased, is that a minor deviation from the permission granted will not take the permittee outside of his permission and that operation of the vehicle on such a minor deviation will be held to be within the coverage of the omnibus clause of the insurance policy. In Speidel v. Kellum, supra, the court equated minor deviation from permission with minor deviation from the scope of employment and concluded that the facts demonstrated a major deviation from the permission to use the

vehicle (and also from the scope of his employment) and concluded that under the facts, the driver was not operating the vehicle with permission of the owner, as a matter of law.

In the case at bar, we have no question of deviation from scope of employment. While Bruner was paid for his time in taking the automobile from Suggett's home to the MFA service station, he was a regular employee of the service station. Thus, from the time he got to work Saturday morning until the time he would start home Saturday evening, he was not in Suggett's employee. As a consequence, such cases as Speidel v. Kellum and those discussed in the annotation at 5 A.L.R.2d 600, are little help in determining the issues in the case at bar. See Winterton v. Van Zandt, Mo., 351 S.W.2d 696. Neither is the relationship between Suggett and Bruner one of socially "boon companions" as was considered in Winterton, supra, or of blood relation as is considered in some of the other cases hereinafter cited.

The relation between Suggett, the owner of the vehicle, and Bruner, the driver, occupies a middle ground. Bruner was a longtime trusted casual employee of Suggett. They were neighbors. At least during much of this time, he had other regular employment and worked for Suggett on weekends and after his regular employment hours. During the period in question, he frequently worked for Suggett an hour in the evening, feeding cattle and doing chores on the Suggett farm. Suggett frequently called Bruner to perform personal errands for him, such as bringing groceries and supplies to the Suggett farm when he came home from work, taking this and other cars to town to be serviced and repaired, etc. This relationship continued from the time of the wreck up to the time of the trial. In connection with his employment by Suggett, Bruner habitually operated vehicles and machinery on the farm and off the farm when necessary to his employment, without specific instructions. His practice of eating lunch at Cecil's cafe

where his wife worked and where he washed dishes during his lunch hour was well known to Suggett. He normally drove his truck from the service station to the cafe but because he took Suggett's car to the service station to be repaired, he was without transportation of his own.

It is well established that permission under an omnibus clause of an insurance policy may be either expressed or implied, see Mazdra v. Selective Insurance Company, Mo., 398 S.W.2d 841; Hanover Insurance Company v. Abchal, Mo.App., 375 S.W.2d 605; Straughan v. Asher, Mo. App., 372 S.W.2d 489; Haynes v. Linder, Mo.App., 323 S.W.2d 505; McKee v. Travelers Insurance Company, Mo.App., 315 S. W.2d 852; and Varble v. Stanley, Mo. App., 306 S.W.2d 662. While implied permission may be the result of common practice or a course of conduct between the parties wherein the owner acquiesces in the practice of another operating the owner's vehicle, see Mazdra v. Selective Insurance Company, Mo., 398 S.W.2d 841, and Bourne v. Manley, Mo.App., 435 S.W.2d 420, implied permission is not limited to such situations.

When we speak of implied permission we are actually considering a permission, not verbally expressed, but provable by circumstantial evidence. See, in addition to the cases above cited, Stoll v. Hawkeye Casualty Company of Des Moines, Iowa (CA–8), 193 F.2d 255. Such implied permission is easier to find where the relationship between the parties is social rather than business; where the driver is not acting as an employee at the time of the accident and where the automobile is used for non-business rather than business or commercial purposes. See Scott v. Massachusetts Bonding & Insurance Company, Ky. App., 273 S.W.2d 350; Wise v. Ohio Casualty Insurance Company, D.C.W.D., Ky., 96 F.Supp. 380.

In Yorkshire Indemnity Co. of New York v. Collier (C.A.6) 172 F.2d 116, the owner of a horse farm in Kentucky in-

structed one of his employees to wash his personal automobile, take it down the highway and fill it with gasoline and have it back available for the owner's use at 5:00 p. m. The employee could do these things at anytime that suited him, just so the vehicle was back at 5:00 p. m. He washed the car on the farm, then took it to a filling station and filled it with gas. Instead of returning directly to the farm, he took a joy ride, with his girlfriend who had accompanied him, beyond the service station in a direction away from the farm. An accident occurred four or five miles away from the farm and well before 5:00 p. m. The court found that this was not such an unusual use of a vehicle as to be outside the scope of permission granted by the owner.

In Stoll v. Hawkeye Casualty Company of Des Moines, Iowa (CA–8), 193 F.2d 255, the driver asked his cousin to borrow the cousin's pickup truck to go get a pack of cigarettes. The cousin consented but instead of going for the cigarettes, the driver and another cousin who was with him picked up two girls and during the ensuing ride, the truck turned over. The court reversed a directed verdict for the insurance company and held that the question of whether or not the driver was operating the vehicle with the permission of the owner was for the jury.

In Wise v. Ohio Casualty Insurance Company, D.C.W.D., Ky., 96 F.Supp. 380, a husband took his wife's individually owned car, without her knowledge, picked up a friend and drove some distance to a nearby city. They had several drinks and during the evening the friend became the driver of the automobile. While the husband was asleep in the back seat, the friend bought some illegal whiskey (this was unknown to the husband) and was involved in a wreck while attempting to run away from federal officers. The court indicated that the operation of the vehicle by the husband would be with the permission of the owner-wife but that the illegal activity of the friend could not be held to be within the scope of permission given.

In Vezolles v. Home Indemnity Company, New York, D.C.W.D., Ky., 38 F.Supp. 455, the driver of the automobile and his date had dinner at the home of the owner of the automobile and his bride. The owner permitted the driver to use his car to take his date home. He was to return and then the owner would take the driver to the driver's home. When the driver returned to the owner's home early in the morning, the owner and his wife were asleep and the house was locked. The driver then proceeded to drive himself home and on the way, stopped at a cafe for something to eat and with a friend, took a short ride. This operation was held to be with the implied permission of the owner.

In the case at bar, Bruner was not shirking any duty he owed to Suggett. He was not at the time of the collision in an employer-employee relation with Suggett. The vehicle was not at the time being used in the farming operations of Suggett. We cannot say that Bruner's use of the vehicle to drive to lunch when he did not have his own vehicle was unusual or unnatural under all of the circumstances.

Permission has a negative, as well as an affirmative, connotation. The absence of a prohibition against an expected or foreseeable or natural use may be strongly indicative that such use is permissible. See Bourne v. Manley, Mo.App., 435 S.W.2d 420; Yorkshire Indemnity Co. of New York v. Collier (C.A.6) 172 F.2d 116; and Vezolles v. Home Indemnity Company, New York, D.C.W.D., Ky., 38 F.Supp. 455. It must be remembered that Suggett placed no prohibition or limitation on Bruner's use of the vehicle. It was within the knowledge of both Suggett and Bruner that Bruner normally had his truck available for transportation and normally used it to go to Cecil's cafe at noon time. On this day, Bruner had no personal transportation because he took Suggett's car to the filling station. Nothing in the evidence gave any indication that Suggett desired to alter Bruner's habits or to prohibit him from his

normal course of action. Under all of these circumstances, we conclude that the trier of fact was amply justified in finding permission within the meaning of the omnibus clause of the MFA policy. We cannot say that the judgment below was clearly erroneous. Civil Rule 73.01(d), V.A.M.R. See Bourne v. Manley, Mo.App., 435 S.W.2d 420. Such is our own independent conclusion after a careful examination of all the facts.

From all of the evidence we believe it can reasonably be inferred that the parties intended for the vehicle to be operated in accordance with Bruner's known regular daily routine of eating lunch and washing dishes at Cecil's cafe during the noon hour. Such use of the vehicle was within the contemplation of the parties at the time the operation of the vehicle was originally entrusted to Bruner.

The judgment is affirmed.

All concur.