PATRICIA BRECKENRIDGE, Judge.
 

 Forrest Holtkamp, defendant ad litem in the interest of Marty Holtkamp, deceased, and Progressive Specialty Insurance Company, who is Marty Holtkamp’s automobile insurer, appeal the trial court’s entry of a directed verdict in favor of Nautilus Insurance Company on Nautilus’ petition for declaratory judgment. Nautilus had sought a declaration of no coverage under a garage operations insurance policy issued to 1-70 Used Cars, Inc., for an accident that occurred when a car owned by I-70 Used Cars and driven by Rickey Ridge-way collided with a car driven by Marty Holtkamp. The trial court found that Mr.
 
 *510
 
 Ridgeway was not covered under the policy.
 

 Mr. Holtkamp raises four points on appeal, and Progressive raises one point. One of Mr. Holtkamp’s points alleges that the evidence supporting coverage was sufficient to withstand Nautilus’ motion for directed verdict. Mr. Holtkamp’s remaining points and Progressive’s sole point allege that the judgment was not supported by the evidence and was against the weight of the evidence. This court finds that the judgment was not the entry of a directed verdict but was a decision on the merits and should be reviewed as any other court-tried case. The trial court’s finding that Mr. Ridgeway was operating the car- outside the scope of the permission granted by the named insured and, therefore, was not covered by Nautilus’ policy was supported by sufficient evidence and was not against the weight of the evidence. The judgment is affirmed.
 

 Factual and Procedural Background
 

 Mr. Ridgeway was in the business of cleaning vehicles and operated an unincorporated business called Detail Service. His base of operations was an address in Columbia. In the first week of May 2000, Mr. Ridgeway went to 1-70 Used Cars in Columbia and made an offer to its owner, Norman Dietzel, to detail cars for $40 per car. Mr. Dietzel understood the word “detail” to mean totally clean the car, including “the inside, engine, truck and exteri- or.” Mr. Ridgeway gave Mr. Dietzel his business card, which indicated that Mr. Ridgeway’s business was in Columbia. The two men agreed that Mr. Ridgeway would take the cars and bring them back clean the same day, and then Mr. Dietzel would pay Mr. Ridgeway. Mr. Ridgeway told Mr. Dietzel that he was going to take the cars to his Columbia address, and Mr. Dietzel believed that Mr. Ridgeway performed all of his detail work in Columbia.
 

 Mr. Dietzel did not consider Mr. Ridge-way to be an employee, representative, or agent of 1-70 Used Cars, and Mr. Ridge-way understood that he was not an employee of 1-70 Used Cars. Mr. Dietzel did not give Mr. Ridgeway any instructions on how to detail cars, nor did he give him any supplies or tell him where to detail the cars. Mr. Ridgeway had experience in detailing cars, knew what materials he needed, and had bought the materials before he offered to detail cars for Mr. Diet-zel.
 

 Mr. Ridgeway took the first ear he detailed for 1-70 Used Cars to his Columbia address, cleaned it inside and out, and returned it the same day. Mr. Dietzel paid him $40. On another occasion, Mr. Dietzel gave Mr. Ridgeway a second car to detail. Mr. Ridgeway took this second car to his Columbia address, cleaned it, and returned it the same day. Mr. Dietzel paid Mr. Ridgeway $40. Mr. Dietzel did not give Mr. Ridgeway permission, on either of these two occasions, to drive the cars for his personal use, nor did Mr. Ridgeway use the cars to pick up the supplies needed to detail the cars.
 

 Within the same week, Mr. Ridgeway obtained a third car from Mr. Dietzel to detail. Mr. Ridgeway obtained the car, a 1988 Oldsmobile, at about 2:00 or 3:00 in the afternoon of May 4, 2000. Mr. Ridge-way told Mr. Dietzel he would take the car, detail it, and return it by the time the dealership closed that evening, which was 6:00. According to Mr. Dietzel, Mr. Ridgeway had permission to drive the Oldsmobile to wherever he cleaned it and bring it back to the dealership. Mr. Diet-zel did not give Mr. Ridgeway permission to drive the Oldsmobile for personal use, including allowing others to ride in the car, nor did Mr. Dietzel give Mr. Ridgeway permission to drive the car outside of Columbia or to drink alcohol and drive the
 
 *511
 
 car. Mr. Ridgeway did not ask Mr. Diet-zel’s permission to have another person in the car or to take the car outside of Columbia, nor did he advise Mr. Dietzel that he needed to use the car to obtain additional supplies to detail the car. Mr. Diet-zel understood that Mr. Ridgeway would take the car to his place of operations in Columbia, detail it, and return it to 1-70 Used Cars that evening.
 

 After picking up the car from 1-70 Used Cars, Mr. Ridgeway took it to his Columbia address, detailed it, and then drove it to Centraba. In Centraba, he bought some beer and went to the home of an acquaintance, Bob Nelson. While at Mr. Nelson’s home, Mr. Ridgeway started drinking the beer. Mr. Ridgeway and Mr. Nelson left and drove to the home of Glen and Annette VanVactor in Mexico, Missouri. Mr. Ridgeway was unable to remember whether he was drinking during the drive from Centraba to Mexico. Mr. Ridgeway sociabzed and drank beer at the VanVactors’ home in Mexico for over forty-five minutes before he and Mr. Nelson left, with Mr. Ridgeway driving.
 

 Shortly after leaving, however, Mr. Ridgeway realized that he had left his cigarettes and alcohol at the VanVactors’ home. He turned around in the middle of the street to go back and, in doing so, hit a fence owned by Andrea Wilier. Ms. Wilier and a friend were outside at the time. After smelling alcohol on his breath and hearing Mr. Ridgeway’s slurred speech, Ms. Wilier asked Mr. Ridgeway if he had been drinking. Mr. Ridgeway admitted that he had. When Ms. Wilier asked Mr. Ridgeway why he turned around in the middle of the street, Mr. Ridgeway told her that he and his girlfriend were in a fight and he thought he saw her going the opposite direction, so he was trying to turn around to follow her.
 

 Mr. Ridgeway then drove back to the VanVactors’ home and picked up his cigarettes and alcohol. According to Mr. Ridgeway, when he left the VanVactors’ home the second time, sometime between 8:30 and 9:00 p.m„ he was driving to a shop in Mexico owned by his friend, Forrest Zeltner, for the purpose of obtaining supplies to repair the headliner in the Oldsmobile. Mr. Zeltner was not aware, however, that Mr. Ridgeway was coming to obtain those suppbes. Moreover, in his deposition, which was admitted into evidence, Mr. Dietzel stated that he did not recab having a conversation with Mr. Ridgeway regarding Mr. Ridgeway’s repairing the Oldsmobile’s headliner. Indeed, Mr. Diet-zel did not recall what kind of condition the Oldsmobile’s headliner was in before he gave the car to Mr. Ridgeway to detail.
 

 About five minutes after he left the Van-Vactors’ home the second time, Mr. Ridge-way, who was driving approximately sixty to seventy miles per hour, ran a stop sign and hit a truck. The cobision kiUed the driver of the truck, Marty Holtkamp, and injured Mr. Ridgeway and Mr. Nelson. After hitting the truck, the Oldsmobile bounced off of the truck and hit a house that was owned by Darren Bertrand.
 

 An officer who arrived at the accident scene smebed the odor of an intoxicating beverage inside the Oldsmobile and on Mr. Ridgeway’s person and noticed that Mr. Ridgeway’s speech was slurred, his movements were slow, he was having difficulty following simple instructions, and he was combative. Additionally, the officer found several open beer bottles in the Oldsmobbe and the empty packaging from a twelve-pack of beer.
 

 After the accident, Nautbus Insurance Company, 1-70 Used Cars’ insurer, filed a petition for declaratory judgment, naming as defendants the estate of Marty Holt-kamp, Mr. Ridgeway, Mr. Nelson, Mr. Bertrand, and 1-70 Used Cars. In its petition, Nautbus asked the court for a decía-
 
 *512
 
 ration that the garage operations insurance policy Nautilus issued to 1-70 Used Cars did not cover the accident. In particular, Nautilus cited the policy provision that defines who is an insured under the policy:
 

 SECTION II — LIABILITY COVERAGE
 

 A. Coverage
 

 [[Image here]]
 

 1. Who Is An Insured
 

 a. The following are “insureds” for covered “autos”:
 

 (1) You for any covered “auto”.
 

 (2) Anyone else while using with your permission a covered “auto” you own, hire or borrow except:
 

 [[Image here]]
 

 (c) Someone using a covered “auto” while he or she is working in a business of selling, servicing, repairing, parking or storing “autos” unless that business is your “garage operations”.
 

 Nautilus claimed that Mr. Ridgeway was not an employee, representative, or agent of 1-70 Used Cars at the time of the accident or at anytime prior to the accident, was not operating the Oldsmobile with the permission of 1-70 Used Cars at the time of the accident, and was in the business of servicing and repairing cars. For these reasons, Nautilus claimed that Mr. Ridgeway was not an insured under the policy and the accident was excluded from coverage. Progressive, who provided uninsured motorist coverage to Marty Holtkamp, was granted leave to intervene. Nautilus filed a motion for summary judgment, which was overruled.
 

 A trial without a jury was held on June 4, 2003, and the court entered judgment on July 9, 2003. In its judgment, the court found that Mr. Ridgeway did not have express or implied permission to use the Oldsmobile for his personal use and, even if he did have some form of permission to drive the car, his actions constituted a material deviation from that permission. Additionally, the court found that Mr. Ridgeway fell under the policy’s exclusion from coverage for contractors who are in the business of “selling, servicing, repairing, parking or storing” the cars outside of 1-70 Used Cars’ “garage operations.” Mr. Holtkamp and Progressive filed this appeal.
 

 Standard of Review
 

 In one of his points, Mr. Holtkamp argues that the trial court erred in entering a directed verdict in favor of Nautilus because the evidence was sufficient to withstand such a verdict. Mr. Holtkamp contends that he made a submissible case for coverage and asks that this court reverse the directed verdict and remand the case to the trial court for a jury trial.
 

 Mr. Holtkamp misunderstands the procedural posture of this case. Although Nautilus, the plaintiff, demanded a jury trial in its petition, it appears that the parties later agreed to a trial without a jury. On the day of the trial, Nautilus presented evidence to the court and rested. The court then asked each of the defendants if they wished to present evidence. Mr. Holtkamp offered the deposition testimony of Mr. Dietzel and rested. The court asked the remaining defendants if they wished to present any evidence, and they declined. The court then asked Nautilus if it had any further evidence. At that point, Nautilus filed a motion for a directed verdict, which the court took with the case.
 

 In its judgment, the court stated that it was granting Nautilus’ motion for a directed verdict. In this court-tried case, however, there was “no verdict to direct.”
 
 Roberts v. Wilson,
 
 97 S.W.3d 487, 491 (Mo.App.2002). The trial court’s judgment was a verbatim adoption of Nautilus’ proposed
 
 *513
 
 findings of fact and conclusions of law. This procedure, although not
 
 per se
 
 erroneous, has been routinely criticized in numerous cases.
 
 See, e.g., Massman Constr. Co. v. Mo. Highway & Transp. Comm’n,
 
 914 S.W.2d 801, 804 (Mo. banc 1996);
 
 Nolte v. Wittmaier,
 
 977 S.W.2d 52, 57 (Mo.App.1998);
 
 Stelling v. Stelling,
 
 769 S.W.2d 450, 452 (Mo.App.1989). In this case, the adopted language in the judgment appears to have created confusion as to the procedural posture of the case. Nevertheless, because the judgment indicates that the trial court properly applied the law and exercised the “ ‘necessary judicial consideration’ ” of the dispositive issue before it, any irregularities in the judgment are not grounds for reversal.
 
 See id.
 
 at 452-58.
 

 Essentially, “a motion for directed verdict in a court-tried case submits the issue for a decision on the merits” and, therefore, this court considers such a motion “to be a motion for a judgment pursuant to Rule 73.01.”
 
 Cadle Co. v. Shearer,
 
 69 S.W.3d 122, 124 (Mo.App.2002).
 
 [1]
 
 Thus, this court will review the case on its merits, under the standard set forth in
 
 Murphy v. Carron,
 
 536 S.W.2d 30, 32 (Mo. banc 1976).
 
 Roberts,
 
 97 S.W.3d at 491. The trial court’s judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.
 
 Murphy,
 
 536 S.W.2d at 32.
 

 Mr. Holtkamp and Progressive argue that the trial court’s judgment is not supported by substantial evidence and is against the weight of the evidence. In determining whether the judgment is supported by substantial evidence, this court views the evidence and any inferences therefrom in the light most favorable to the trial court’s judgment, disregarding all contrary evidence and inferences.
 
 Barrows v. Firstar Bank,
 
 103 S.W.3d 386, 390 (Mo.App.2003). In reviewing the evidence, this court “should defer to the trial court in judging the credibility of witnesses and resolving conflicting evidence.”
 
 Blackburn v. Habitat Dev. Co.,
 
 57 S.W.3d 378, 385 (Mo.App.2001). “ ‘The power to set aside a trial court’s judgment on the ground that it is against the weight of the evidence should be exercised with caution and with a firm belief that the decree or judgment is wrong.’ ”
 
 Brizendine v. Conrad,
 
 71 S.W.3d 587, 590 (Mo. banc 2002) (quoting
 
 Searcy v. Seedorff,
 
 8 S.W.3d 113, 116 (Mo. banc 1999) (internal citations omitted)).
 

 No Permission for Personal Use
 

 Mr. Holtkamp and Progressive first argue that the trial court’s finding that, at the time of the accident, Mr. Ridgeway was using the Oldsmobile without the permission of Mr. Dietzel is not supported by substantial evidence and is against the weight of the evidence. The court found that Mr. Ridgeway was using
 
 *514
 
 the Oldsmobile for his personal use at the time of the accident, and he had neither express nor implied permission to do so. Mr. Holtkamp and Progressive argue that the evidence shows that Mr. Ridgeway was not using the car for his personal use but, rather, was using it for a business purpose. Thus, before addressing the scope of permission granted Mr. Ridgeway, this court must first determine whether, at the time of the accident, Mr. Ridgeway was using the car for business or personal use.
 

 The evidence showed that, after Mr. Dietzel and Mr. Ridgeway agreed that Mr. Ridgeway would detail the Oldsmobile, Mr. Ridgeway drove the car to his Columbia address and detailed it. Mr. Ridgeway then drove the car to Centraba, where he bought beer. Next, he drove to Mr. Nelson’s house and drank some of the beer. From there, he drove himself and Mr. Nelson to the VanVaetors’ home in Mexico, where he drank more beer and socialized for over forty-five minutes before leaving, with Mr. Ridgeway driving. After they left the VanVaetors’ home, Mr. Ridgeway realized he had forgotten his cigarettes and beer at the VanVaetors’. He turned the car around in the middle of the street and, in the process, hit a fence. When asked by the owner of the fence why he was turning around in the middle of the street, Mr. Ridgeway said he was trying to follow his girlfriend. Mr. Ridgeway returned to the VanVaetors’ and retrieved his cigarettes and beer. The accident occurred approximately five minutes after he left the VanVaetors’ home the second time.
 

 Mr. Holtkamp and Progressive argue that the record shows that Mr. Ridgeway drove to Mexico for the business purpose of obtaining materials to fix the headliner in the Oldsmobile. Mr. Ridgeway testified in his deposition, which was admitted into evidence, that he agreed with Mr. Dietzel that he would fix the headliner. Mr. Dietzel testified that he probably did agree to Mr. Ridgeway’s fixing the headliner. According to Mr. Ridgeway, he went to Mexico for the purpose of going to an upholstery shop owned by his friend, Mr. Zeltner, to buy cloth to replace the headliner and to get assistance from Mr. Zeltner. He testified that he went to the VanVaetors’ home because he thought another acquaintance lived there, and this other acquaintance knew Mr. Zeltner. He further testified that he was actually on his way to the upholstery shop when the accident occurred.
 

 The trial court was not required to believe that Mr. Ridgeway was driving to the upholstery shop when the accident occurred. The accident occurred between 8:30 and 9:00 p.m., and Mr. Zeltner was not aware that Mr. Ridgeway was coming to his shop. Moreover, the trial court was not required to believe that Mr. Ridge-way’s purpose for driving to Mexico was to obtain material to repair the headliner. “The trial court is free to believe or disbe-beve all, part or none of the testimony of any witness.”
 
 Schuster v. Shelter Mut. Ins. Co.,
 
 857 S.W.2d 381, 386 (Mo.App.1993). “The trial court may disbelieve testimony even when uncontradicted.”
 
 Id.
 
 The trial court was free to disbelieve Mr. Ridgeway’s testimony, and this court will defer to the trial court’s decision to do so.
 
 Blackburn,
 
 57 S.W.3d at 385. When Mr. Ridgeway’s testimony is disregarded, the evidence, in the light most favorable to the judgment, shows that Mr. Ridgeway used the car for personal, rather than business, use.
 

 The next issue, then, is whether Mr. Ridgeway had Mr. Dietzel’s permission to use the Oldsmobile for personal use. The issue of permissive use of an automobile “is a question of fact which may be satisfied by a showing of either express or implied permission.”
 
 State Farm Mut. Auto. Ins. Co. v. Scheel,
 
 973
 
 *515
 
 S.W.2d 560, 567 (Mo.App.1998). “Permission is express if it is of an affirmative character, directly and distinctly stated, clear and outspoken, and not merely implied or left to inference.”
 
 Shelter Mut. Ins. Co. v. See,
 
 46 S.W.3d 65, 67 (Mo.App.2001).
 

 The evidence, in the light most favorable to the trial court’s judgment, is that Mr. Dietzel gave Mr. Ridgeway the keys to the Oldsmobile and told him to detail it. In response, Mr. Ridgeway told Mr. Dietzel he would detail the car and return it that evening. This conversation indicates that Mr. Dietzel gave Mr. Ridge-way express permission to use the Oldsmobile on May 4, 2000, for the purpose of detailing it and returning it to 1-70 Used Cars that evening. Mr. Dietzel did not give Mr. Ridgeway express permission for any other use of the car.
 

 Having found that Mr. Dietzel did not give Mr. Ridgeway express permission to drive the car for his personal use, this court next looks at whether such permission was implied. Implied permission is permission that is “not verbally expressed, but provable by circumstantial evidence.”
 
 Kemp v. MFA Mut. Ins. Co.,
 
 468 S.W.2d 700, 704 (Mo.App.1971). “Implied permission is determined from the facts and circumstances of the case and usually arises from a course of conduct of the parties over a period of time.”
 
 See,
 
 46 S.W.3d at 67. “Implied permission may be the result of a common practice or course of conduct whereby the owner acquiesces in the practice of another operating his automobile.”
 
 Id.
 
 In determining whether implied permission exists in a situation where a car “ ‘is loaned for a specific purpose but used for some other purpose, a general permission or a comprehensive permission is much more readily to be assumed if the use of the vehicle is for social rather than business purposes’ ” and where the employer-employee relationship does not exist.
 
 Winterton v. Van Zandt,
 
 351 S.W.2d 696, 701 (Mo.1961) (quoting 7 Appleman, INSURANCE Law & PractiCE, section 4368 (Supp.1961)).
 
 See also Kemp,
 
 468 S.W.2d at 704 (stating that “implied permission is easier to find where the relationship between the parties is social rather than business; where the driver is not acting as an employee at the time of the accident and where the automobile is used for non-business rather than business or commercial purposes”).
 

 In this case, although Mr. Ridgeway was not an employee of Mr. Dietzel’s or 1-70 Used Cars, the relationship between the two men was strictly business, analogous to that of an employer and an independent contractor. There is no evidence that they had any kind of personal or non-business relationship. Mr. Dietzel had never met or heard of Mr. Ridgeway until Mr. Ridge-way came to 1-70 Used Cars and offered to detail cars, which were inventory of the business of 1-70 Used Cars, for a fee. Mr. Ridgeway told Mr. Dietzel that he would take the cars to his Columbia address, which was listed on Mr. Ridgeway’s business card. Mr. Dietzel accepted Mr. Ridgeway’s business proposal. The two men agreed that Mr. Ridgeway would take the cars and bring them back clean the same day, and then Mr. Dietzel would pay Mr. Ridgeway for his detailing service.
 

 Mr. Dietzel gave Mr. Ridgeway the keys to cars to detail on three occasions. On the first two occasions, Mr. Ridgeway drove the cars straight to his Columbia address, detailed them, and returned the cars to 1-70 Used Cars when he was finished detailing them. Mr. Ridgeway testified that he did not use either of those two cars to pick up supplies, and there is no evidence that Mr. Ridgeway used either of the first two cars for personal use. According to Mr. Dietzel, Mr. Ridgeway returned those two cars within the appropri
 
 *516
 
 ate three-to-five-hour period that it takes to detail a car, and both cars were detailed to Mr. Dietzel’s satisfaction. Mr. Ridge-way used the first two cars solely for the business purpose of detailing them, and there is no evidence of a common practice or course of conduct indicating that Mr. Dietzel acquiesced in Mr. Ridgeway’s using the cars for his personal use.
 
 Cf. Ohio Cas. Ins. Co. v. Safeco Ins. Co.,
 
 768 S.W.2d 602, 604 (Mo.App.1989) (finding employees had implied permission to use an employer’s van for night of drinking and driving from course of conduct whereby the van had previously been used, with employer’s knowledge, by employees for personal reasons during the day and evening hours).
 

 Mr. Holtkamp and Progressive argue, however, that Mr. Dietzel’s failure to place any explicit restrictions on Mr. Ridgeway’s use of the cars was evidence that Mr. Ridgeway had implied permission to use the cars for his personal use. In support of this argument, Mr. Holtkamp and Progressive cite
 
 Cameron Mutual Insurance Co. v. Bollinger,
 
 834 S.W.2d 848, 851 (Mo.App.1992) and
 
 Universal Underwriters Insurance Co. v. Michael,
 
 781 S.W.2d 119, 123 (Mo.App.1989). In those cases, the court noted that permission can be derived from both positive and negative factors, and “[t]he absence of an explicit restriction is a strong indication that the use is permissive.”
 
 Bollinger,
 
 834 S.W.2d at 851-52.
 
 See also Michael,
 
 781 S.W.2d at 123.
 

 The circumstances of
 
 Bollinger
 
 and
 
 Michael,
 
 however, are far different than those in this case. In
 
 Bollinger,
 
 the court found that the driver, who performed farm labor for the named insureds, had implied permission to use the named insureds’ farm truck for his personal use because the named insureds did not put any restrictions on his use. 834 S.W.2d at 850-52. The court based this finding, however, on such facts as: the driver was not acting as an ordinary employee, because he was a friend of the named insureds’ son and was living with the named insureds; the named insureds were aware that the driver had been using the truck for his personal use; and, on the night of the accident, the named insureds saw the driver using the truck for his personal use, issued no restrictions on his using the truck, and specifically gave him permission to continue driving the truck that night.
 
 Id.
 
 at 851. Here, the relationship between Mr. Ridge-way and Mr. Dietzel was strictly business, and there was no evidence indicating that Mr. Ridgeway had a history of using the cars he had detailed for his personal use or that Mr. Dietzel was aware that Mr. Ridgeway was using the Oldsmobile for his personal use.
 

 Likewise, in
 
 Michael,
 
 this court held that the friend of a car dealership’s employee had implied permission to use the dealership’s demonstrator car. 781 S.W.2d at 122-24. This court noted that the dealership had given the demonstrator car to the employee with express permission to drive it for business and personal use with the sole restriction that travel be limited to the Kansas City metropolitan area; the employee had “broad and unfettered” discretion to let others drive the car; the friend was driving the car at the specific request of the employee, who was too intoxicated to drive; and one of the dealership’s vice-presidents testified that he would delegate permission to drive the demonstrator car to the person who was with an intoxicated employee.
 
 Id.
 
 Thus, the dealership in
 
 Michael
 
 expected, if not encouraged, its employees to use and let others use the demonstrator cars for personal and business use and, in that particular instance, expected someone other than the intoxicated employee to drive the car. In this case, Mr. Dietzel gave Mr. Ridge-way express permission to use the car only for a business use and there was no evidence that he expected or encouraged Mr.
 
 *517
 
 Ridgeway to use the car for his personal use.
 

 Nevertheless, Mr. Holtkamp argues that Mr. Ridgeway’s personal use of the car was expected and foreseeable because Mr. Dietzel was aware that Mr. Ridgeway did not have a car of his own. Mr. Holtkamp notes that “[t]he absence of a prohibition against an expected or foreseeable or natural use may be strongly indicative that such use is permissible.”
 
 Kemp,
 
 468 S.W.2d at 705. When asked if he knew how Mr. Ridgeway got to 1-70 Used Cars, Mr. Dietzel said he did not recall. This evidence does not support a finding that Mr. Dietzel was aware that Mr. Ridgeway did not have a car of his own. Even if Mr. Dietzel did know that Mr. Ridgeway did not have a car of his own, however, Mr. Ridgeway’s using the Oldsmobile to drive to Centralia to buy beer and socialize with a friend before driving the friend to Mexico to socialize with more friends was not an expected, foreseeable, or natural use under the circumstances. Mr. Ridgeway did not have implied permission to drive the car for his personal use.
 

 The trial court’s finding that Mr. Ridge-way was operating the car outside the scope of the permission granted by the named insured and, therefore, was not covered by Nautilus’ policy was supported by sufficient evidence and was not against the weight of the evidence. The judgment is affirmed.
 

 All concur.
 

 [1]
 

 . Rule 73.01(b) provides only for the defendant, at the close of plaintiff’s evidence, to “move by motion for a judgment on the grounds that upon the facts and the law the plaintiff is not entitled to relief.” In this case, the plaintiff, Nautilus, moved for a directed verdict. In
 
 Dynamic Computer Solutions, Inc. v. Midwest Marketing Insurance Agency, L.L.C.,
 
 91 S.W.3d 708, 714 (Mo.App.2002), this court stated that it did not “read Rule 73.01 as precluding a motion in a judge-tried case for a judgment for the plaintiff at the close of the plaintiff's case based on conclusive evidence and the applicable law.” That is because there are "instances where the facts on which the plaintiff was relying for recovery were not legally subject to dispute by and were conclusive on the defendant, entitling the plaintiff to judgment as a matter of law.”
 
 Id.
 
 That Nautilus made the motion at the close of all of the evidence instead of at the close of its case further justifies treating the judgment as a decision on the merits and reviewing the case like any other court-tried case.