**AMERICAN FAMILY INSURANCE GROUP, a Wisconsin corporation, Plaintiff,**

v.

**Christopher L. HOWE, Raymond Sloan, as Special Administrator of the Estate of Lori Jean Sloan, Deceased; and Larry A. Seney; and Farmers Insurance Exchange, a member of the Farmers Insurance Group, a California corporation, North River Insurance Company, a New Jersey corporation, Defendants.**

No. CIV 83–4015.

United States District Court, D. South Dakota, S.D.

April 16, 1984.

Douglas M. Diebert, Sioux Falls, S.D., for plaintiff.

William P. Fuller, Sioux Falls, S.D., for defendants Larry A. Seney and Farmers Ins. Exchange.

Richard L. Travis, Beresford, S.D., for defendant Christopher Howe.

Arthur L. Rusch, Vermillion, S.D., for defendants Raymond Sloan and North River Ins. Co.

## MEMORANDUM DECISION AND ORDER

NICHOL, Senior District Judge.

The plaintiff, American Family Insurance Group (hereinafter referred to as American Family), filed a complaint against the above-named defendants seeking declaratory relief as to the rights and other legal relations of the parties under an insurance policy. Jurisdiction is premised upon 28 U.S.C. section 2201 and upon diversity of citizenship pursuant to 28 U.S.C. section 1332.

The insurance policy in question was issued by American Family to Laurence D. Brady (hereinafter referred to as Brady) of Vermillion, South Dakota. This policy provided, among other things, for automobile liability coverage on a 1975 GMC Jimmy owned by Brady. On January 18, 1980, the 1975 GMC Jimmy owned by Brady was involved in a one-car accident. At the time of the accident the Jimmy was being driven by defendant Christopher Howe, a part-time employee of Brady. As a result of the accident Lori Jean Sloan was killed and defendant Larry Seney was injured. Defendant Raymond Sloan is the duly appointed and acting administrator of the estate of Lori Jean Sloan.

The question presented is whether American Family has a duty to defend Christopher Howe (hereinafter referred to as Howe) in any legal action or to indemnify Howe, should he be held liable for damages to any party arising from this accident under the automobile liability policy issued to Brady. It is undisputed that this policy was in force at the time of the accident.

Coverage under the policy requires a determination of whether Howe, at the time of the accident, was operating the Jimmy within the terms of the omnibus clause or additional insured clause of the insurance policy.

The policy issued to Brady by American Family contained the following clause which extends liability coverage under the terms of the policy to *"any person using such automobile with the permission of the named insured, provided his operation or, if not operating, his other actual use thereof is within the scope of such permission."* (Emphasis added). If Howe was operating the Jimmy on January 18, 1980, with the permission of the insured Brady or his wife Beth Marie Brady, then he may become an additional insured under the policy and may be entitled to the protection of the policy without having himself procured the policy. The operation of an omnibus clause creates liability insurance in favor of persons other than the named insured to the same degree as the named insured. *See* 12 Couch on Insurance 2d (Rev.Ed.) section 45:293 at 618–19 (1981); *Birrenkott v. McManamay*, 65 S.D. 581, 276 N.W. 725 (1937). To trigger the effects of the omnibus clause, Howe must have been operating the Jimmy at the time of the accident with Brady's permission. In the absence of permission American Family would have no contractual obligations under its policy to defend or indemnify Howe.

### EXISTENCE OF PERMISSION

In a diversity action this Court is bound to apply the substantive law of the forum jurisdiction. *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Therefore, South Dakota statutes and common law apply to the issues before the Court.

The permission required to bring an additional insured within the protection of an omnibus clause may generally be express or implied. *Stoll v. Hawkeye Casu-*

*alty Co.*, 193 F.2d 255 (8th Cir.1952) (applying South Dakota law); *Traders & General Insurance Co. v. Powell*, 177 F.2d 660 (8th Cir.1949); *National Farmers Union Property & Casualty Co. v. Ronholm*, 153 N.W.2d 322 (N.D.1967) (cited by the S.D. Supreme Court in *Western Casualty & Surety Company v. Anderson*, 273 N.W.2d 203 (S.D.1979)); *Brochu v. Taylor*, 223 Wis. 90, 269 N.W. 711 (1936).

■ To constitute express permission the evidence must be of an "affirmative character, directly, and distinctly stated, clear and outspoken, and not merely implied or left to inference." *Hinton v. Indemnity Insurance Company*, 175 Va. 205, 8 S.E.2d 279, 283 (1940). Clearly no express permission to use the vehicle existed for Howe to use the Brady vehicle at the time, place, and for the purpose in which he was engaged at the time of the accident. The evidence reveals that Howe had express permission only to use the vehicle involved in the accident (1975 GMC Jimmy) to pull a trailer for work related purposes, i.e., haul junk to the dump grounds; haul a snowblower for snow removal at Brady's rental property and one of his local businesses. On January 18, 1980, Howe was not involved in any of the above permissive uses but had embarked on a personal mission or "lark" of his own. If permission existed on January 18, 1980, such permission must have been implied.

Whether or not implied permission existed at the time of the accident presents a question of fact. *Edgar v. Travelers Insurance Company*, 351 F.2d 690 (8th Cir. 1965); *Traders & General Insurance Company v. Powell, supra; Bekaert v. State Farm Mutual Auto Insurance Co.*, 230 F.2d 127 (8th Cir.1956); *Derusha v. Iowa National Mutual Insurance Co.*, 49 Wis.2d 220, 181 N.W.2d 481 (1970). The South Dakota Supreme Court in *Western Casualty & Surety Company v. Anderson*, 273 N.W.2d 203 (S.D.1979) (hereinafter referred to as Western), held that to establish the existence of implied permission or consent there must be a "showing of a course of conduct or practice known to the

owner and acquiesced in by him that would lead to an implication of permission for a particular venture." *Id.* at 205. The court also held that the failure of the owner to object to the use would not by itself be deemed consent. *Id.*

■ In accord with the rule stated in *Western*, the evidence must establish that under all the circumstances a course of conduct or practice must have existed known to Bradys and acquiesced in by them. *Id.* This course of conduct or practice must also lead to a clear inference that Howe had permission to use the vehicle for the particular venture that he was on at the time of the accident. *Id.* Implied permission arises upon consideration of such factors as the past and present conduct of the insured, relationship between the driver and the insured, and usage and practice of the parties over an extended period of time prior to the use in question. *See Andrews v. Commercial Casualty Insurance Co.*, 128 Neb. 496, 259 N.W. 653 (1935); *State Farm Mutual Auto Insurance Co. v. Kersey*, 171 Neb. 212, 106 N.W.2d 31 (1960) (overruled on other grounds, *Arndt v. Davis*, 183 Neb. 726, 163 N.W.2d 886 (1969)); *National Farmers Union Property & Casualty Co. v. Ronholm*, 153 N.W.2d 322 (N.D.1967); *See also*, 12 Couch on Insurance 2d (Rev.Ed.) section 45:352 at 696–99 (1981). In addition, some courts have stated that the usage and practice of the parties should be such that would indicate to a reasonable mind that the driver had the right to assume permission under the particular circumstances. *United States Fidelity & Guaranty Co. v. Brann*, 297 Ky. 381, 180 S.W.2d 102, 104 (1944); *Tomasetti v. Maryland Casualty Company*, 117 Conn. 505, 169 A. 54, 55 (1933); *See* 12 Couch on Insurance 2d (Rev.Ed.) section 45:352 at 696–99 (1981).

■ The burden of proof is upon the defendants to show that Howe's use at the time of the accident was with the permission of the Bradys since Howe is a stranger to the policy in question and not the named insured. *Western, supra* at 205; *See also American Universal Insurance*

*Company v. Dykhouse,* 326 F.2d 694, 698 (8th Cir.1964); *Derusha v. Iowa National Mutual Insurance Co.,* 49 Wis.2d 220, 181 N.W.2d 481, 482 (1970); *Mitchell v. Automobile Underwriters of Des Moines,* 225 Iowa 906, 281 N.W. 832 (1938); *Hartford Accident & Indemnity Co. v. Peach,* 193 Va. 260, 68 S.E.2d 520, 522 (1952); 12 Couch on Insurance 2d (Rev.Ed.) section 45:363, 364 (1981).

A determination of the existence of implied permission or consent requires the Court to consider the nature of the relationship between Brady and Howe and the course of conduct or practice between them with respect to the use of motor vehicles owned by Brady.

### A. Relationship Between Bradys and Christopher Howe

At the time of the accident Howe was employed part-time by Brady. This employment started in July of 1979 and involved the performance of odd jobs at Brady's farm and several of his places of business in Vermillion. The work entailed such things as feeding the cat and horses, mowing lawns, and snow removal. In connection with this employment Howe was at times given permission to use motor vehicles owned by Brady. A clear dispute exists between the parties as to the nature and extent of Howe's use of these vehicles for his own personal use. At the time he began his employment with Brady and at the time of the accident on January 18, 1980, Howe was fifteen years of age and possessed a restricted driver's license. This license authorized Howe to operate motor vehicles between the hours of 6:00 A.M. and 7:00 P.M. The Bradys were aware of the restrictions on Howe's license.

The relationship between the Bradys and Howe was that of employer and employee. Although a social and work relationship existed between Howe's mother Judy and Beth Brady this does not alter the fact that Howe was an employee. It has been held by a number of courts that in determining whether coverage exists under an omnibus clause, weight must be given to the relationship of the parties and to the probabilities which that relationship would normally generate. *See* Couch on Insurance 2d (Rev.Ed.) section 45:352 at 699 (1981). If the relationship is one of blood or principal and agent, weaker evidence will support a finding of permissive use. *Elkinton v. California State Auto Asso. Interstate Insurance Bureau,* 173 Cal. App.2d 338, 343 P.2d 396 (1959). The same inference may be created when close friends are involved. *State Farm Mutual Auto. Insurance Co. v. Zurich American Insurance Co.,* 62 N.J. 155, 299 A.2d 704 (1973). The employer and employee relationship that existed between Howe and Bradys does not create any inferences of implied permission. There can be no doubt that an employment relationship creates different probabilities than does that of parent and child.

### B. Course of Conduct or Practice

Howe's testimony reveals that he had authority to use several of the Brady vehicles primarily for work related purposes. Howe was given access to an El Camino to get himself from home to school to work and home after work. Howe understood that these were the uses he could make of this vehicle. This arrangement was for the mutual benefit and convenience of the Bradys and Howe. Since Howe lived some distance from the school and the school was some distance from work, this arrangement obviated the need for one of the Bradys to pick Howe up at school to transport him to work.

The Bradys also owned a 1975 four-wheel drive GMC Jimmy. Howe understood that this vehicle was to be used to pull a trailer to haul things to the dump grounds or to haul the snowblower to Brady's various places of business to clear the walks and parking lots of snow. Howe also had been given permission by the Bradys on other occasions to run specific errands in connection with his work for the Bradys.

Howe testified to a number of occasions in which he used the Jimmy for personal

use. One of these uses was by express permission from Brady following a request by Howe. This related to road hunting for pheasants near the Brady farm during daylight hours. This was also testified to by Brady. Howe, however, admitted taking a number of other hunting trips with the Jimmy without any express permission from either of the Bradys. Howe stated that as many as ten hunting trips were taken without express permission. However, most of these trips were with the El Camino and not the Jimmy. Furthermore, Bradys were generally out of town when these hunting trips were taken.

With respect to Brady's knowledge about his use of the vehicles for hunting, Howe stated that on at least one occasion a vehicle was low on gas (not clear which vehicle) and Brady confronted him about it. Howe claims that he told Brady at that time that he had been using the vehicle for hunting and after telling him Brady did not object. Brady, however, had no recollection of this confrontation. Howe's claim that Brady knew about the hunting trips must be considered in light of his other statements concerning the hunting trips. Howe testified that when these trips were taken the Bradys were usually out of town and that he himself would spend his own money for gas for the vehicles. By using his own money to put in gas it would conceal to some extent his uses of the vehicle if gas consumption was being checked as opposed to mileage. Furthermore, Howe stated that the hunting business never came up between him and Brady. These statements make it unconvincing that Brady knew about the hunting trips at least to the full extent that Howe actually used the vehicles for hunting.

Other than the hunting trips Howe testified that he used the Jimmy on several other occasions for personal or social purposes. Howe stated that he used the Jimmy after dark to go to a movie with a friend; however, Howe stated that Brady had no knowledge of this particular use. On one other occasion Howe claimed he received a call from somebody at Brady's Taco John's business in Vermillion asking him to pick up some cheese from Brady's garage and deliver it to them. This occurred after dark and while Bradys were out of town. The Jimmy was used for this job due to the unavailability of the El Camino. It is undisputed that Bradys had no knowledge of this trip. There was testimony about a trip to Ethan to pick up cheese. This trip was never made by Howe himself but was taken with Brady. In addition, Howe testified that on several occasions he kept the Jimmy overnight at his house when Bradys were out of town so he could drive to school to work and home from work. This was confirmed by Howe's mother.

Defendant Larry Seney testified that he had ridden around town with Howe in the El Camino on several occasions and had gotten a ride to school from Howe a couple of times in the El Camino. Prior to the night of the accident Seney stated that he had ridden with Howe in the Jimmy one time on a Saturday night. On that night they were driving around in the El Camino and then later on switched to the Jimmy. This is the same sequence that they followed on the night of the accident.

Bradys followed a custom of keeping the keys to their vehicles in the ignition and locking the doors. They would carry a door key and also had a set of keys available in the house. Howe knew where the keys were kept in the house and was given a key to the house when Bradys were gone so that he could gain access to the house to feed the cat. It was also pointed out that access to the Jimmy could be gained without a door key by entering the rear window which could not be locked. Howe was provided with a door key to the El Camino. There is no evidence that the Bradys attempted to deny access to these vehicles by hiding the keys or similar actions.

During the several months prior to the accident on January 18, 1980, the Bradys were required for business and other reasons to be out of town on extended trips. At the time of the accident they were both

out of town and not scheduled to return for several days after the accident.

In their absence Howe was given specific instructions concerning the work he was to perform. Beth Brady instructed Howe to feed the cat and the horses several times a day. Larry Brady instructed Howe to use the Jimmy to pull the trailer with the snowblower loaded in it and to use the snowblower to clear the snow at Brady's rental property and other places of business in Vermillion. (This permission will be referred to as snow removal). This job obviously was necessary only if it snowed and there was snow that needed to be moved. There was no evidence that on January 18, 1980, the day of the accident, that there was any snow that needed moving which would trigger the express permission given by Brady to use the Jimmy. These instructions were consistent with the testimony of Howe.

The sequence of events that transpired prior to the accident according to Howe and Seney was that Howe had picked up Seney at his house in the El Camino at approximately 6:00 P.M. on Friday, January 18, 1980. They met two additional people later on that evening, one of whom was Lori Sloan. They discussed and decided to take a "road trip" to Elk Point, a distance of approximately fifteen miles from Vermillion. According to Howe, the El Camino was low on gas and since they needed more room since there were four people (the El Camino was at most a three passenger vehicle), he decided to switch vehicles. Howe and Seney proceeded to the Brady farm and swapped the El Camino for the Jimmy. There was no one home at the Brady farm at the time of this switch. Seney testified that he asked Howe whether he had permission to use the Jimmy and Howe replied that he did not.

After swapping vehicles Howe and Seney picked up Lori Sloan and another girl whom they had met earlier. After purchasing some beer, this group started the trip to Elk Point. On the way to Elk Point, Howe and the others drank some of the beer. The unidentified girl was dropped off in Elk Point, and with Howe, Seney and Lori Sloan in the Jimmy they started back to Vermillion. At approximately 9:00 P.M. on the way back they had a one-car accident fatally injuring Lori Sloan and injuring Seney.

In response to questioning whether he thought that Bradys would have given him permission to use the Jimmy under the circumstances, Howe replied that he did not know. In his deposition, however, Howe stated that the Bradys would not have given permission, particularly with the beer drinking involved.

A dispute exists as to what if any instructions or restrictions were placed upon Howe's use of Bradys' vehicles. The Bradys contend that they repeatedly told Howe that the El Camino was to be used to get to school, work, and was not to be used for goofing around or joyriding. This is at least partially consistent with the understanding that Howe had concerning the use of the El Camino. Brady also claims that he told Howe not to drink and drive and also not to allow friends to ride in the vehicle. These restrictions the Bradys contend were exhorted to Howe on numerous occasions. These restrictions were not, however, conveyed to Howe's mother. Howe contends that nothing was ever said to him concerning his using the vehicles to joyride or transport friends. Howe also claimed that he was never told unequivocally that he could not use the Jimmy. On the other hand, Howe did not receive any blanket authorization from Bradys to use the vehicles for personal use.

In addition, on at least one occasion Howe and his mother were at the Bradys for dinner and the Bradys with Judy Howe's consent served Chris Howe some beer. After dinner and the beer Howe went home with his mother. The Bradys also testified that they sometimes checked up on Howe's use of the vehicles by driving by Howe's house at night, checking mileage, gas usage, and by turning the wheels a certain way and returning later to see if they had been moved. Their observation can best be described as random as op-

posed to systematic. In addition, the Bradys stated that no reports were received from people in the community that Howe was misusing any of the vehicles nor were they personally apprised of any personal use being made of the vehicles by Howe.

Subsequent to the accident the Bradys had a conference with Howe and his parents. This conference related to exploring the reasons why Howe took the vehicle, and Brady stated he told the Howes that he considered filing theft charges against Howe but since Howe intended to bring the Jimmy back that it probably did not constitute theft. Brady invited Howe to return to work but told Howe that he would not have access to any of the vehicles. Howe did return to work for Brady but there was no indication how long after the accident this employment continued.

Bradys contend that they were not aware that any of their vehicles were being used by Howe for personal use. The only strictly personal use that they state they were aware of was the one hunting excursion in which permission was requested and was granted. They deny any knowledge of Howe's use of the vehicle for attending a movie and delivering cheese to Taco John's after dark. Howe does not claim that Bradys knew anything about these trips.

█ The only permission that Bradys claim they extended to Howe was to use the El Camino for transportation from home to school and from school to work and home. The Jimmy was only to be used for snow removal in accord with Brady's instructions. All other uses of the Jimmy according to Brady were for specific errands while working with Brady on various jobs. Howe's use of the Jimmy on January 18, 1980, was not within this restricted permission. Although Howe had access to the Jimmy during their absence, this does not by itself amount to permission to use the vehicle for personal use. Howe did not have implied permission merely by obtaining possession of the Jimmy and by using it. 12 Couch on Insurance 2d (Rev.Ed.) section 45:341 at f.n. 12, 683 (1981).

Howe contends that Brady was aware that he was using the vehicles for hunting but the Bradys disclaim any such knowledge. The instance upon which Howe relied to support his claim that Brady had knowledge about his hunting trips (other than the one in which he requested and received permission) was the alleged confrontation with Brady over the gas consumption of a vehicle. Brady, however, did not recollect this confrontation.

In review, the nonbusiness uses Howe made of the Brady vehicles prior to the accident were (1) hunting trips; (2) trip to the movie; (3) riding around town. The business or business related uses prior to the accident were (1) driving to school, to work and home; (2) delivery of cheese to Taco John's; and (3) business errands while working for the Bradys with express permission.

The Bradys claim knowledge of only one hunting trip. This trip occurred after Howe requested and received permission to do so from Brady. They deny any other knowledge of Howe's personal use or non-business connected use of the vehicles. Bradys were not shown to have been aware of the delivery of the cheese, the trip to the movie, or joyriding around town. The trip involving the delivery of the cheese and the movie occurred when the Bradys were out of town. The Bradys further doubt whether the delivery of cheese occurred, as described by Howe, because they do not keep cheese in the garage as Howe had indicated.

█ The Court finds that based upon the totality of the circumstances that the defendants have not met their burden of proof as to the showing of implied permission. The existence of an employer/employee relationship does not create any inference of implied permission to use the vehicle nor has a course of conduct or practice known to the Bradys been shown to establish implied permission. A course of conduct upon which a finding of implied permission must be predicated must be known to the owner and acquiesced in by them. *Western, supra* at 205; *see also,*

*National Farmers Union Pro. & Cas. Co. v. Ronholm, supra* at 327. The only knowledge of personal use of the vehicles that can reasonably be imputed to Bradys relates to the one hunting trip in which permission was requested and granted. Assuming that Bradys had knowledge of one or more additional instances in which Howe had used the Jimmy or El Camino for hunting without special permission, it would not be sufficient to show a course of conduct or practice acquiesced in by Bradys upon which it might reasonably be inferred that Howe had permission to use the Jimmy on the venture which resulted in the accident. Nothing in the record would support Howe assuming that he had permission to use the Jimmy for the venture on January 18, 1980. Howe himself told Larry Seney when they went to pick up the Jimmy on the night of the accident that he did not have permission to use the Jimmy. Furthermore, Howe testified in his deposition that he doubted that Brady would have given consent to such a use, particularly with the beer drinking involved. Howe under the circumstances could not reasonably believe that he had permission to use the Jimmy for the particular use he made of the vehicle on January 18, 1980.

Implied permission as contemplated by the rule stated in *Western, supra,* does not arise merely because Howe as an employee of Brady was able to obtain possession of the Jimmy without Brady's knowledge. *See, Brochu v. Taylor,* 223 Wis. 90, 269 N.W. 711 (1936); *M.F.A. Insurance Companies v. Mendenhall,* 205 Neb. 430, 288 N.W.2d 270, 274 (1980); *Bourne v. Manley,* 435 S.W.2d 420 (Mo. App.1968); 12 Couch on Insurance 2d (Rev. Ed.) section 45:355 at 704 (1981). Providing the opportunity for Howe to take the Jimmy without any physical impediments does not constitute consent for Howe to use the vehicles for his own personal ventures. *Dickinson v. Great American Indemnity Co.,* 296 Mass. 368, 6 N.E.2d 439 (1937).

The personal uses testified to by Howe were for the most part uses which he made of the vehicles without the knowledge of the Bradys. The hunting trips, the movie and riding around town were generally if not always made when the Bradys were out of town. There was little if any connection or attachment between these uses and other uses where the Bradys' consent or permission was necessary. Mutuality of agreement was clearly lacking between the acts of Howe in using the vehicles for personal use and specific consent by the Bradys. Howe's unilateral actions cannot form the basis of implied consent. The acts and knowledge of Bradys with respect to Howe's conduct is the only thing of legal significance. This case does not involve the question of negligent entrustment. Restatement (Second) of Torts section 390 (1965).

The permission contemplated by an omnibus clause is something more than mere sufferance or tolerance without taking steps to prevent. *M.F.A. Insurance Companies v. Mendenhall, supra.* The term "permission" is used more in the sense of "leave, license or authority with power to prevent." *Id.; see also, Cooper v. Fireman's Fund Insurance Company,* 252 S.C. 629, 167 S.E.2d 745 (1969). Howe obtained possession and use of the Jimmy on the night of the accident without Brady's knowledge and implied permission does not exist on this basis alone. *M.F.A. Insurance Companies v. Mendenhall, supra* 288 N.W.2d at 275. The Nebraska Supreme Court has stated that "... isolated instances of permission for a specific purpose under recurring special circumstances do not amount to a 'course of conduct indicating mutual acquiescence or lack of objection under circumstances signifying assent' to a use for a purpose 'wholly unrelated in time, character, or circumstances.' " *Id.* The permission in fact given to Howe to drive any of the vehicles was for a specific purpose—drive to school to work and home, perform errands in connection with his employment, specifically to use the Jimmy for snow removal functions, and on one occasion to use the Jimmy to road-hunt near town and the Brady farm. Under the

totality of the circumstances no implied permission existed for Howe to use the Jimmy to take the "road trip" with his friends to Elk Point and drink beer on a "lark" of his own.

Nor is this a case involving continuous and unrestricted use and control over a vehicle. *See, Persellin v. State Auto Insurance Asso.,* 75 N.D. 716, 32 N.W.2d 644 (1948); *American Employers Insurance Co. v. Johns,* 122 Ga.App. 577, 178 S.E.2d 207 (1970); *Bourne v. Manley, supra.* Brady retained ultimate control over the use of the vehicle and permitted Howe as an employee to use the vehicle on a regular basis for primarily if not exclusively business related purposes.

Defendants claim that general custody, unlimited and continuous use of the vehicles, was conferred on Howe by Brady. This statement is not, however, supported by the record. The fact that Howe could obtain physical possession of the vehicles without impediments such as the vehicles being locked in a garage or warehouse or the keys locked up or hidden does not confer general custody, unlimited and continuous use upon Howe. Continuous use of vehicles by employees is generally reserved for employees in responsible positions which require continuous use of their employer's vehicles, such as outside salesmen. 12 Couch on Insurance 2d (Rev.Ed.) section 45:456 at 832–33 (1981); *Persellin v. State Auto Insurance Asso., supra.* Furthermore, these employees are generally not subordinate to their employers as to specific instructions or supervision regarding the use of the vehicles entrusted to them. *Id.* This is clearly not the case here in that Howe was a part-time employee hired to do odd jobs and was given restricted use of the vehicles and not unlimited, unrestricted and continuous use of the vehicles in the sense of these terms as described above.

Under this type of circumstances it has been stated that in order to establish permission for an employee to use his employer's vehicles for personal uses there must be "either express words to this effect or some definite acts or conduct on the part of the employer which would lead the employee to believe that such permission was intended." 12 Couch on Insurance 2d (Rev. Ed.) section 45:355 at 702 (1981) (See cases cited therein. No such express words or definite acts or conduct existed here which could conceivably lead Howe to believe that he had permission on January 18, 1980, to use the Jimmy for the purpose and manner in which he did.

## C. Initial Permission

Ordinarily, the absence of express or implied permission would obviate consideration of questions relative to deviations from the scope of permission. The defendants, however, have urged the Court to apply the "initial permission" rule to the facts of this case, which rule modifies the showing necessary to establish permission as will be discussed below. The Court now considers whether the initial permission rule applies in South Dakota.

The courts which have considered the questions relating to coverage under omnibus clauses are not in agreement as to the legal theory that should be applied to determine the scope of permission or liability under such clauses. Essentially three views have been expressed: (1) strict or conversion rule; (2) minor deviation rule; and (3) liberal or initial permission rule. Under the "conversion rule" once permission is given to use a vehicle by the owner the use of the vehicle by the permittee must conform to the time, place and uses specified or contemplated by the parties as the time of granting permission. 12 Couch on Insurance 2d (Rev.Ed.) section 45:465 at 847 (1981). Any deviation from the time, place and use restrictions will preclude coverage under the omnibus clause. *Id.*

The "minor deviation" rule represents the intermediate rule in that it provides that once permission is conferred the protection afforded by the omnibus clause will not terminate unless the permittee commits a major or gross violation or deviation from the terms of the permission conferred or contemplated at the time permission was given in the first instance. 12 Couch on

Insurance 2d (Rev.Ed.) section 45:475 at 863 (1981). Conversely, a minor to slight deviation will not terminate or cut off the protection of the omnibus clause.

The "initial permission" or liberal rule, or as some authorities have called this rule the "hell or high water" rule, provides that once permission to use a vehicle is given in the first instance, any subsequent deviations from that permission is absolutely immaterial. *United States Fidelity & Guaranty Co. v. Millers Mutual Fire Insurance Co.*, 396 F.2d 569, 572 (8th Cir. 1968) (Applying Illinois law, *Konrad v. Hartford Accident & Indemnity Co.*, 11 Ill.App.2d 503, 137 N.E.2d 855 (1956)); *Dickinson v. Great American Indemnity Co.*, 296 Mass. 368, 6 N.E.2d 439 (1936); *Stovall v. New York Indemnity Co.,* 157 Tenn. 301, 8 S.W.2d 473 (1928); 12 Couch on Insurance 2d (Rev.Ed.) section 45:469 at 852–53 (1981). Under this rule if the initial taking was with the insured's consent, every act subsequent thereto is held to be within the insured's permission therefore within the protection of the omnibus clause.

The defendants urge the Court to apply the "initial permission" rule. American Family, however, argues that under any rule Howe was not within the protection of the omnibus clause. The South Dakota Supreme Court and South Dakota State Legislature have not expressly adopted any of the competing rules for circumscribing the scope of permission.

The defendants contend that if the "initial permission" rule were applied here coverage would exist under the omnibus clause. This contention is premised on the assumption that "initial permission" or "first instance" permission existed on January 18, 1980, by virtue of Brady giving express permission to Howe to use the Jimmy to pull the trailer loaded with the snowblower to remove snow at the rental property and Brady's other places of business. What Howe had was a restricted permission to use the Jimmy under certain circumstances, none of which existed on the night of the accident.

In *United States Fidelity & Guaranty Co. v. Millers Mutual Fire Insurance Co., supra,* the Eighth Circuit, applying Illinois law, stated that although a restriction was placed on the use of the car by the person driving the car at the time of the accident *"once any restricted permission* is given for use of the vehicle ... this permission extends to *any use* as far as insurance coverage for third persons is concerned." *Id.* at 572. (emphasis in original); *See Konrad v. Hartford Accident & Indemnity Co.*, 11 Ill.App.2d 503, 137 N.E.2d 855 (1956). "Once an owner voluntarily hands over the keys to his car the extent of permission he actually granted is irrelevant." *United States Guaranty Co. v. Fisher*, 88 Nev. 155, 494 P.2d 549, 552 (1972) (Insured gave neighbor permission to park her car at his place in her absence and to move it in case of emergencies—Indiana law).

There can be no doubt that the Bradys granted Howe restricted permission to use the Jimmy and in fact transferred constructive possession of the vehicle to Howe during their absence to use the vehicle for the instructed purposes. The only fact of which Bradys must have knowledge under this rule is the initial transfer of possession to Howe for him to use for the instructed purposes. 12 Couch on Insurance 2d (Rev. Ed.) section 45:469 at 856 (1981). Permission under the initial permission rule involves only a transfer or delivery of possession of the vehicle. *Id.* This is in distinct contrast to the requisite factual showing necessary to establish implied permission under the rule stated in *Western, supra.* Once permission exists in this sense then any subsequent use is with the permission of the insured within the context of an omnibus clause. If the possession of the vehicle was by consent of Bradys then initial permission existed on January 18, 1980.

The Court finds that possession of the Jimmy had been entrusted to Howe, albeit for restricted use, by the Bradys; therefore initial permission existed although at the time of the taking of the Jimmy on January 18, 1980, Howe was

clearly outside the scope of the restricted permission that had been conferred. *United States Fidelity & Guaranty Co. v. Millers Mutual Fire Insurance Co., supra; See also, Hartford Accident & Indemnity Co. v. Peach*, 193 Va. 260, 68 S.E.2d 520 (1952); *United States Fidelity & Guaranty Co. v. Fisher, supra; Carey v. Ory*, 421 So.2d 1003, 1006 (La.App.1983); *Stovall v. New York Indemnity Co., supra*, 8 S.W.2d at 477; *Drewek v. Milwaukee Automobile Insurance Co.*, 207 Wis. 445, 240 N.W. 881, 882 (1932).

Having concluded that initial permission existed at the time of the accident requires the Court to determine whether the "initial permission" rule should be applied under South Dakota law. The South Dakota Supreme Court and the South Dakota Legislature have not specifically addressed the applicability of the "initial permission" rule.

▉ This Court recognizes that in exercising diversity jurisdiction (28 U.S.C. section 1332), it may in the absence of a controlling statute or decision of the highest court of the state apply any rule it believes the South Dakota Supreme Court would adopt. *Gnirk v. Ford Motor Co.*, 572 F.Supp. 1201, 1204 (D.S.D.1983); *McElhaney v. Eli Lilly & Co.*, 564 F.Supp. 265, 268 (D.S.D.1983). American Family, however, contends that the South Dakota Supreme Court in adopting the implied permission rule in the case of *Western, supra*, inferentially rejected the application of the "initial permission" rule or any other rule. Furthermore, American Family argues that the court in that case could have applied the "initial permission" rule if it had chosen to do so. The defendants, however, contend that the question of adopting any of the competing rules was never presented to the court in *Western*. The South Dakota Supreme Court in *Western* never had to reach the question of whether the driver exceeded the scope of permission because it held that implied permission existed for the driver to use the vehicle for the particular venture he was on at the time of the accident. *Id.* at 205. The Court concludes that

the South Dakota Supreme Court has not clearly decided this issue either way and therefore will determine what rule the South Dakota Supreme Court would adopt under the circumstances presented in this case.

Courts that have adopted the "initial permission" rule have generally relied upon a liberal construction of statutes mandating omnibus clauses in automobile insurance policies or statutes imputing liability directly upon owners of automobiles who give consent to another to drive their vehicles.

The Minnesota Supreme Court in *Jones v. Fleischhacker*, 325 N.W.2d 633 (Minn. 1982), adopted the initial permission rule in the context of a father giving permission, albeit restricted, to his minor son to drive the family car. The court in *Jones v. Fleischhacker, supra*, arrived at this result based upon a liberal construction of Minn. Stat. section 170.54 (1980). This statutory provision provided that:

(w)henever any motor vehicle shall be operated within this state, by any person other than the owner, with the consent of the owner, express or implied, the operator shall in the case of accident, be deemed the agent of the owner of such motor vehicle in the operation thereof.

*Jones v. Fleischhacker, supra* at f.n. 1 p. 635 (quoting statute). The court held that public policy in Minnesota dictated that this statute be accorded a construction that would achieve the remedial purpose of the statute—compensating persons injured by negligent operation of automobiles. *Id.* at 636. The court in *Jones v. Fleischhacker, supra*, also stated that a liberal construction was particularly appropriate in situations involving minors. *Id.*

The Minnesota Supreme Court in 1983 extended the application of the "initial permission" rule to a situation involving an adult giving permission to another adult. *Milbank Mutual Insurance Co. v. United States Fidelity & Guaranty Co.*, 332 N.W.2d 160 (Minn.1983) (hereinafter referred to as Milbank Mutual). This case specifically involved a project superintendent on a construction job giving restricted

permission to a construction foreman to use a company vehicle to drive home from the job site although company rules prohibited such a use. *Id.* at 162. The court in *Milbank Mutual* relied upon a liberal construction of Minn.Stat. section 170.54 (quoted above) as a basis for extending the "initial permission" rule to the factual situation presented in the case. The liberal construction of the owner's consent statute the court stated was dictated by the public policy objectives of the statute. *Id.* at 165. The court also found public policy support for its holding in other statutes that existed in Minnesota: (1) Minn.Stat. 65B.06 (1982)—insures the procurance of auto liability coverage by persons unable to secure such coverage through ordinary insurance markets; (2) Minn.Stat. 65B.13 (1982)—prohibits discrimination among operators of automobiles based upon race or physical handicap; (3) Minn.Stat. 65B.15 (1982)—placed limitations on the ability of insurers to cancel or reduce policy limits during the policy period; (4) Minn.Stat. 65B (1982)—Minnesota No-Fault Insurance Act. It was against this statutory or public policy background that the Minnesota Supreme Court in *Jones v. Fleischhacker* and *Milbank Mutual* applied the "initial permission" rule.

In *Farm Bureau Mutual Insurance Company v. Hmelevsky*, 97 Idaho 46, 539 P.2d 598 (1975), the Idaho Supreme Court applied the "initial permission" rule to a situation involving a parent giving initial permission to a daughter to drive the family car for a specified or limited purpose. At the time of this decision Idaho had a statute (I.C. section 49–1521(b)) which required that all vehicle owner policies contain an omnibus clause. *Id.* at 601. I.C. section 49–1521(b) provided that such policies "shall insure the person named therein and any other person, as insured, using such motor vehicle or motor vehicles with the express or implied permission of such named insured." *Id.* The court in adopting the "initial permission" rule stated that all motor vehicle policies must be construed in conformance with the Safety Responsibility Act of which I.C. section 49–1521(b) is

a part. *Id.* The policy and remedial purpose of the Safety Responsibility Act was to protect the public against irresponsible drivers. *Id.* The Safety Responsibility Act governed the policy involved in the case before the court in *Farm Bureau Mutual Insurance Co. v. Hmelevsky, supra.*

Furthermore, when the Idaho Supreme Court in *Farm Bureau Mutual Insurance Co. v. Hmelevsky* considered the applicability of the three competing rules for defining the scope of permission, they held that none of them could be adopted for universal application since each rule tended to ignore the differences that existed in each situation as it related to the relationship between the parties involved. *Id.* The court stated that consideration of deviations from express permission is more appropriate in the business context, i.e., employer/employee situations, but not practical or proper in a parent/child context. *Id.* The court held that:

> (w)e therefore conclude that insofar as a family context situation is concerned, the word "permission" as used in the statutes and automobile insurance policies means general permission to at least occasionally use a family vehicle. Precise permission to do what the driver is doing at the precise moment of the accident is unnecessary.

*Id.* at 602. The Idaho Supreme Court's adoption of the "initial permission" rule rests upon the statutory mandate of an omnibus clause in all policies and is limited to the family context as opposed to the business context. *Id.*

In other jurisdictions courts have also found the existence of a statute mandating an omnibus clause to be significant in their adoption of the "initial permission" rule. *United States Fidelity & Guaranty Co. v. Fisher*, 88 Nev. 155, 494 P.2d 549 (1972) (the policy of the legislature in enacting statute mandating the inclusion of an omnibus clause must be considered in examining coverage under the clause); *Protective Fire & Casualty Co. v. Cornelius*, 176 Neb. 75, 125 N.W.2d 179 (1963) (the omnibus clause statute must be construed to

accomplish the purpose and policy of the legislation). The existence of a statute such as the owner consent statute in Minnesota and the statutorily mandated omnibus clause in Idaho served in each case as the vehicle upon which the courts implemented the public policy arguments advocated on behalf of the "initial permission" rule. The public policy arguments advanced on behalf of the "initial permission" rule are premised on the theory that an insurance contract is as much for the benefit of the public as for the insured and that it is undesirable to permit litigation as to the details of the permission and use. *Konrad v. Hartford Accident & Indemnity Co.,* 11 Ill.App.2d 503, 137 N.E.2d 855 (1956).

### D. Public Policy Arguments Advanced for the Adoption of the Initial Permission Rule in South Dakota

Defendants argue that the public policy of South Dakota expressed in S.D.C.L. section 32–35–70; S.D.C.L. sections 58–23–7 and 8; S.D.C.L. section 58–11–9; S.D.C.L. section 58–11–9.4; repeal of S.D.C.L. section 32–34–1; and the South Dakota Supreme Court's decision in *Walz v. City of Hudson,* 327 N.W.2d 120 (S.D.1982), dictates or suggests that the South Dakota Supreme Court would adopt the "initial permission" rule under the facts of this case. The Court does not agree with the defendants that South Dakota's statutory configuration and the public policy underlying the statutes and decisions of the South Dakota Supreme Court compel the adoption of the "initial permission" rule here.

S.D.C.L. section 32–35–70 requires the inclusion of an omnibus clause in insurance policies which are submitted to certify proof of financial responsibility for the future. This statute has no application to the policy involved in this case. The policy involved here was not a policy governed by the requirements of S.D.C.L. section 32–35–70 and the inclusion of the omnibus clause in the policy before this Court was not mandated by this or any other statute in South Dakota. It is clear that the South

Dakota Financial Responsibility Act applies only to persons who have been convicted of or forfeited bail for certain motor vehicle offenses or who have failed to pay judgments arising out of ownership, maintenance or use of a motor vehicle registered in South Dakota. S.D.C.L. section 32–35–43; *Novak v. State Farm Mutual Auto Insurance Co.,* 293 N.W.2d 452 (S.D.1980). There is no basis for relying on these statutes as a foundation for implementing the "initial permission" rule since they do not apply to the facts of this case. The South Dakota Supreme Court has on several occasions refused to utilize the Financial Responsibility Act as an independent public policy basis for extending or finding the existence of insurance coverage.

In *Novak v. State Farm Mutual Auto Insurance Co., supra,* the court held that a household exclusion clause in an insurance policy did not contravene the public policy of the state as expressed in the financial responsibility law unless the policy has been certified as proof of financial responsibility pursuant to S.D.C.L. section 32–35. *Id.* at 454. In *Dairyland Insurance Company v. Kluckman,* 86 S.D. 704, 201 N.W.2d 214, 217 (1972), the court was urged to construe an insurance policy keeping in mind the public policy expressed in S.D.C.L. section 32–35–70 of the Financial Responsibility Act (same section urged now by the defendants). The court held that "(b)ecause the provisions of the South Dakota Financial Responsibility Act, S.D.C.L. section 32–35, are not applicable to the policy in question, we need not consider whether we should follow cases which have read the provisions of the financial responsibility acts into a liability policy." *Id.* at 217.

The suggestion which was made by a student commentator that South Dakota's financial responsibility statute could be used to produce the same liberal results achieved by Minnesota's courts on the basis of their owner's consent statute is erroneous, given the South Dakota Supreme Court's application of these statutes only to circumstances coming within the control of the statute. Comment, *Delegation Under*

*The Omnibus Clause: Permissive Use or Public Interest,* 17 S.D.L.Rev. 415, 429 (1972); *See also, Milbank Mutual, supra.* The public policy support sought by the defendants does not exist under the Financial Responsibility Act.

The defendants also suggest that S.D. C.L. sections 58–23–7 and 8 which mandate that all insurance companies issuing policies for delivery in South Dakota must offer specified supplemental coverages in automobile liability policies support their claim that public policy dictates the adoption of the "initial permission" rule. These statutes require the offering of the following coverages: (1) accidental death benefits; (2) indemnity for disability; and (3) medical pay coverage. These coverages may be rejected by the insured in writing and are not required to be included in every policy.

Defendants have suggested that the adoption of the "initial permission" rule would merely be a logical extension of the public policy behind requiring that insurance companies offer the specified supplemental coverages. While the Court agrees that the "initial permission" rule would further the broad public policy goals implicit in these statutes, these goals do not rise to the level of dictating the adoption of the "initial permission" rule. The purpose of the specified supplemental coverages furthers more the interests of the insured rather than the general public who might be injured by the negligent operation of a motor vehicle by the insured or an additional insured. Furthermore, the Legislature chose only to require that these coverages be offered but stopped short of mandating their inclusion. The choice of whether to include the supplemental coverages remains a matter of contract between the insured and insurer. This weighs against deriving independent public policy support for the adoption of the "initial permission" rule from these statutes.

S.D.C.L. section 58–11–9 requires that all automobile insurance policies to be delivered or issued in South Dakota must provide for uninsured motorist coverage in amounts in accord with the statute. The defendants argue that this statute provides statutory or public policy support for adopting the "initial permission" rule. The mandating of uninsured motorist coverage and the "initial permission" rule are directed toward the same public policy goal of insuring compensation to the innocent victims of traffic accidents. Uninsured motorist coverage and the "initial permission" rule overlap in certain instances. The defendants Sloan and Seney received compensation under their respective uninsured motorist provisions in their own policies. This fact was stipulated to by the parties. If Howe is found to be an additional insured under Brady's insurance policy by application of the "initial permission" rule, then he would not be an uninsured driver so the uninsured motorist coverage would seemingly not apply. The interrelationship of the uninsured motorist coverage which was available here and the omnibus clause in Brady's policy creates more a question of which insurance company must pay the damages or of how much insurance is available considering a variation in respective policy limits. By virtue of this interrelationship this case does not present a situation in which no remedy or relief was available to the defendants injured in the accident as suggested by the briefs of the defendants.

The public policy evinced by S.D.C.L. section 58–11–9 has been fulfilled and as such does not serve as a source of support for adopting the "initial permission" rule. Uninsured motorist coverage and a liberal construction of an omnibus clause each have their place but one does not dictate the other, or in other words one can logically have one without the other.

S.D.C.L. section 58–11–9.4 mandates only that policies issued or delivered in South Dakota must make available to the insured underinsurance coverage. The insured may, however, elect not to carry underinsurance coverage. Underinsurance provides a method by which the insured can protect himself from insured motorists who negligently operate motor vehicles but do not

carry sufficient coverage to indemnify their victims for all the damages incurred. The public policy implicit in S.D.C.L. section 58–11–9.4 is consistent with and fosters the broad public policy goals offered in support of the "initial permission" rule. S.D.C.L. section 58–11–9.4 may not, however, serve as a statutory or independent public policy basis for adopting the "initial permission" rule. Underinsurance coverage remains a matter of contract between the insured and insurer and provides for the protection of the insured and not the general public.

The defendants claim that South Dakota's repeal of the guest statute, S.D.C.L. section 32–34–1, in 1978, supports their argument that South Dakota would adopt the "initial permission" rule. *See,* S.L.1978, ch. 240 section 1. The guest statute required a showing of willful and wanton misconduct by the owner/operator of a motor vehicle before a guest without compensation may recover damages against the owner/operator. The repeal of the guest statute does foster the broad public policy of compensating the innocent victims of traffic accidents but does not serve as a statutory or public policy basis for adopting the "initial permission" rule.

Finally, defendants have urged that the South Dakota Supreme Court's decision in *Walz v. City of Hudson,* 327 N.W.2d 120 (S.D.1982), provides evidence that the public policy of South Dakota favors the adoption of the "initial permission" rule. In *Walz v. City of Hudson, supra,* the South Dakota Supreme Court created a common law cause of action against liquor licensees whose sale of alcohol in violation of S.D.C.L. section 35–4–78(2) contributes to injuries sustained by third parties. In the absence of S.D.C.L. section 35–4–78(2), which makes it a criminal offense for a liquor licensee to sell any alcoholic beverages, except low point beer, to an intoxicated person, it is very doubtful that the South Dakota Supreme Court would have created this remedy. The statute established both the legal duty and the standard of care upon which the cause of action created by the court rests and without the statute they would not have fashioned this remedy.

*Id.* The statute was held by the court to be for the protection of the general public. *Id.* The defendants have not cited a South Dakota statute comparable to S.D.C.L. section 35–4–78(2) to support their claim that the "initial permission" rule reflects the public policy of South Dakota.

The statutes cited by the defendants to support the "initial permission" rule were essentially enacted to serve specific purposes, whereas S.D.C.L. section 35–4–78(2) upon which the court relied in *Walz v. City of Hudson* and Minnesota's owner consent statute upon which the Minnesota Supreme Court relied to adopt the "initial permission" rule were statutes with a broad remedial purpose of protecting the general public.

In addition, the South Dakota Supreme Court's decision in *Western, supra,* requires that the owner or insured must have known of a course of conduct or practice of a driver such as Howe to use the vehicle for personal use and must have also acquiesced in such use. The adoption of the "initial permission" rule with its emphasis on knowledge only of possession of the vehicle to constitute permission in the first instance would be inconsistent with the court's decision in *Western, supra.*

■ The Court finds that based upon the South Dakota Supreme Court's decision in *Western, supra,* adopting the implied permission rule, the absence of any statutory or independent public policy basis in the South Dakota statutes or common law, and the existence here of an employer/employee relationship as opposed to a family relationship, that the South Dakota Supreme Court would not adopt the "initial permission" rule. There can be no question that under any of the other alternative rules—minor deviation or conversion rules—that Howe would not be an additional insured. This makes it unnecessary for the Court to decide which rule the South Dakota Supreme Court would apply.

The Court finds persuasive in this conclusion that South Dakota's Legislature has not chosen to mandate omnibus clauses in

all automobile liability policies as many other states have done, nor have they enacted an owner's consent statute as exists in Minnesota. There can be little doubt that the existence of these statutes in those jurisdictions which have adopted the "initial permission" rule was significant. Such statutes provided the vehicle for implementing the public policy envisaged by the "initial permission" rule and without these statutes the avenues whereby a court can effect this result depend solely upon public policy inferences from other statutes and decisions. South Dakota's statutory background does not equate with other states in the area of fostering the public policy of compensating innocent victims of automobile accidents. South Dakota, for example, does not have a compulsory liability insurance statute, no-fault compensation plans, state indemnity or unsatisfied judgment funds, nor does it mandate the inclusion of an omnibus clause in all automobile liability policies. South Dakota's financial responsibility statutes do require an omnibus clause in all policies certifying future financial responsibility. The financial responsibility law, however, only applies to instances in which a driver's license has been suspended or a judgment resulting from an automobile accident remains unsatisfied. Furthermore, the South Dakota Supreme Court has restricted the public policy underlying the financial responsibility law only to policies which certify proof of future financial responsibility. *Novak v. State Farm Mutual Auto Insurance, supra.*

The South Dakota Legislature has enacted a statutory scheme which essentially leaves the question of protecting the victims of automobile accidents to the victims themselves by purchasing insurance against such eventualities, i.e., uninsured motorist coverage and underinsurance coverage. This statutory and public policy background does not serve as a vehicle for this Court to adopt the "initial permission" rule. The coverage available under the omnibus clause here is solely a matter of contract. The contract language has clearly limited the application of the omnibus clause to permissive uses within the scope of the permission, which language is inconsistent with the application of the "initial permission" rule.

The Idaho Supreme Court's distinction based upon the family context and nonfamily context is also persuasive. *Farm Bureau Mutual Insurance Co. v. Hmelevsky, supra.* Limits upon the scope of permission may not be appropriate in the family context but they are appropriate under the circumstances of this case involving an employee's use of his employer's vehicle. This distinction bolsters the conclusion reached above that the "initial permission" rule would not be adopted by the South Dakota Supreme Court if presented the question under the facts of this case.

Having concluded that no implied permission existed for Howe to drive the Jimmy on January 18, 1980, and that the "initial permission" rule does not apply, the Court holds that under the insurance policy issued by American Family to Brady, Howe was not an additional insured within the language of the omnibus clause.

The Court hereby ORDERS that judgment be entered in favor of the plaintiff declaring that American Family, the plaintiff, has no contractual duty to defend Howe in any lawsuits arising out of the accident on January 18, 1980, nor does American Family have a duty to indemnify Howe for any amounts for which he is adjudged liable arising out of the accident on January 18, 1980.

The foregoing constitutes the Court's findings of fact and conclusions of law.