**Nancy J. NOLTE and Judith E. Kassing, Appellants,**

v.

**Katherine L. WITTMAIER, et al., Respondent.**

**No. 72416.**

Missouri Court of Appeals, Eastern District, Division One.

July 28, 1998.

Rehearing Denied Sept. 30, 1998.

---

53

Thomas M. Blumenthal, Andrew T. Pickens IV, Paule, Camazine & Blumenthal, St. Louis, for appellant.

Kenton E. Knickmeyer, Conny Davinroy Beatty, Thompson Coburn, St. Louis, for respondent.

GRIMM, Judge.

This case basically involves a suit by two sisters against a third sister[1]. They seek

1. In addition to sister, other relatives of the par-  ties were named defendants, as well as the trust-

recovery of assets previously owned by their parents which their mother gave the third sister. Following a bench trial, the trial court denied their request.

On appeal, they raise five points. First, they allege the trial court erred in adopting verbatim defendant's proposed findings, conclusions, and judgment, and then, thereafter, adopting all defendant's proposed corrections thereto. The next two points allege error in granting a summary judgment against them on Count I, alleging an agreement to make a will. In their fourth point, they allege trial court error in finding on Count II that "there was no legally enforceable partnership agreement among" the parties. Finally, they allege the trial court erred in finding on Count II that defendant did not exercise undue influence on mother. We affirm the trial court's judgment on Count II and reverse and remand the trial court's grant of summary judgment on Count I.

## I. Background

In the 1960's, father invented a boat leveling device and he and mother began manufacturing it. In 1966, they formed Boat Leveler Manufacturing Company. Ultimately, father, mother, and two of their sons-in-law, worked in the business. In addition, defendant worked for a time as a secretary.

In 1974, father and mother executed wills. Each will provided that basically all assets were left in trust for the benefit of the survivor during the survivor's lifetime. Upon the death of the survivor, the trust was to be distributed equally to the three daughters. Further, each will stated that the provisions made for the survivor were in lieu of any homestead allowance or statutory right to maintenance.

Father died in 1979. Plaintiffs testified that in the months before his death, he, mother, daughters, and their husbands discussed tax liabilities, both personal and business. Then, plaintiffs said, within a month of his death, plaintiffs, mother, defendant, and plaintiff Nancy's[2] husband Bill met at a Howard Johnson's. Plaintiffs and Bill testified the taxes were discussed and mother asked if the daughters would be willing to relinquish their inheritance for the purpose of paying the IRS. The women said they would.

Plaintiff Judith testified that the three sisters agreed to let my mother use some of the assets out of our estate, and then we were to share in the rest of my mother's and my father's estate when she died, a third, a third, a third." Defendant was supposed to take care of the paperwork for us, [because] she had always done that for my mother and father, and that then she would do it because she was more available."

Plaintiff Nancy's testimony was similar. According to her, mother said that "we could divide it all up equally, anything that was left." She said they agreed that defendant would do the paperwork and that someday after mother died, the three of them would divide everything up equally.

According to Bill, mother said that when the daughters agreed to relinquish their inheritance, she said "that when her time or demise came that she would make sure that each one— what was left in the estate would be divided equally, share and share alike or a third, a third, a third." He too said that defendant was to take care of the paperwork.

In contrast, defendant testified that she never participated in a conversation at a Howard Johnson's such as plaintiffs and Bill described. Moreover, she said that she never participated "in a conversation like that anywhere." Further, several witnesses said that father had established a rule, which the family followed, not to talk business in a public place.

Father's will was probated. According to his federal estate tax return, his one-half of Boat Leveler's stock was valued at $813,550. The return shows other assets of about $500,000. However, father's estate owed about $350,000 in estate, inheritance, and delinquent income taxes. In addition, his estate

ee of mother's trust and the personal representative of her estate. For ease of reading, except where otherwise necessary, we refer to all defendants collectively as "defendant" or "sister."

2. We refer to individuals by their first name for ease of reading, and not out of disrespect.

owed other sums. Mother owed about $160,-000 delinquent income taxes.

Although father's will stated that mother should not receive either a homestead allowance or support, mother applied for both. She asked for $53,000 for one year's living allowance; her daughters gave their written consent to this request. She also requested $7,500 homestead allowance. The court approved both requests, but nothing in the record indicates that father's estate paid either amount to mother.

Father's will provided that his estate was to pay his debts. However, it did not have sufficient cash to do so. To raise the necessary funds, mother as executrix of the estate petitioned the court for permission to sell $438,012.50 of Boat Leveler stock to Boat Leveler. The court approved the request in October 1982.

Father's estate closed in 1983. At that time, final distribution was made to the trustees of the trust established by the will. The distribution consisted of $462.25 and 1166 shares of Boat Leveler valued at $349,800.

In 1983, mother decided to withdraw from the business. In a series of complex transactions, she effectively conveyed the business to the sisters and their husbands. In exchange, mother received a promissory note.

In the fall of 1984, the sisters and their husbands entered into restrictive stock transfer agreements. The agreements provided that if a shareholder's employment with the corporation was terminated, the corporation had the right to purchase the terminated employee's shares for "book value."

In 1986, mother suffered a stroke leaving her with physical disabilities. Although she was disabled, witnesses described her as "a very determined, clear-thinking individual" and one who "was very confident about what she was doing." Her younger brother said that she was "the boss" even after her stroke and that she "knew exactly what was going on" the last day of her life.

In April 1986, defendant and her husband formed a new corporation, Kay's Dist., Inc. The purpose of the corporation was to purchase, develop, and distribute marine accessories. Evidence would support a trial court finding that this corporation was in competition with the business mother had sold to the three sisters and their husbands.

In December 1986, mother revoked the 1974 will and executed a new will and a revocable trust. This revocable trust agreement contained provisions for gifts to other relatives, with the remainder divided equally among the sisters. All three sisters were aware of the new will and trust and evidence would support a trial court's finding that they consented to the changes.

Within the corporations owned by sisters and their husbands, conflicts arose. Apparently without any previous discussion with plaintiffs or their husbands, defendant's husband sent each of the four a letter on November 15, 1988. Each letter said that the corporations were going to redeem a parties' shares at a specific price with the sale to close on January 12, 1989.

Shareholder meetings of the corporations were held on December 12, 1988. At that time, defendant's husband said he wanted to either completely own the business or wanted to sell out. Because plaintiffs and their husbands did not want to sell out, they told defendant and her husband that they would buy them out pursuant to the restrictive stock transfer agreements. In addition, plaintiffs and their husbands terminated the employment of defendant and her husband as of December 31, 1988. Shortly after the meeting, defendant told her mother that she and her husband had been terminated.

Defendant's husband owned shares in one of the corporations. Pursuant to the restrictive stock transfer agreement, he received $46,141.00 for the book value of his shares. Defendant owned shares in the other corporation. Because that corporation had a negative book value, she received $100 for her shares.

A little over a year later, in January 1990, mother executed an amendment to her revocable trust. In the amendment, she declared that when plaintiffs and their husbands terminated defendant and her husband in 1988, they deprived them of an annual joint income of about $160,000. As a result, she said that she thought they would lose close to $600,000

income before they made what they previously made. In addition, she provided for defendant and her husband to receive $650,000 for the loss in value of their shares in the corporations. Finally, she provided that defendant should receive $300,000 to offset the balance due on a $600,000 note that she was giving plaintiffs. The residue was then to be divided equally among the sisters.

In March 1990, mother purchased a $100,000 annuity designating defendant as the sole beneficiary. In October 1992, she changed the beneficiary on a $218,000 annuity she purchased in 1987 to defendant. Originally, all three sisters were shown as beneficiaries. In January 1993, she purchased a $600,000 annuity and in March a $40,000 annuity. She named defendant as the sole beneficiary of these annuities. The agent who sold her these annuities testified that she met with mother alone, mother told her who to name as beneficiary, and the agent never discussed the beneficiary designations with anybody else.

Mother died on April 28, 1993. At the time of her death, nearly all of her financial assets held outside the revocable trust were structured so that upon her death, they would become the sole property of defendant. After payment of taxes and expenses, defendant netted about $1,544,000.

The revocable trust's assets consisted of 1,166 shares of corporate stock and $462.25. A 1994 Boatmen's Trust Company memorandum states that the shares are "deemed to be worthless." The cash was distributed equally to the sisters.

Plaintiffs commenced this action by filing a Petition to Enforce a Contract and Discover Assets. The matter was submitted to the court on a fourth amended petition. It contains six counts. Count I seeks to enforce an agreement with mother that she leave her estate equally to the sisters and seeks to set aside all transfers to defendant which violated that agreement. Count II seeks to enforce a partnership agreement among the sisters and alleges defendant committed fraud in getting mother to transfer assets to her. Count III alleges that mother committed fraud by having sisters subrogate their rights under father's will and then conspire

with defendant to deprive them of their share. Count IV seeks an accounting for breach of mother's fiduciary duty as executrix and trustee of father's estate and trust. Count V concerns mother's request for a homestead allowance and one year's support from father's estate and seeks an accounting. Count VI asks for punitive damages on Counts IV and V.

Defendant filed a summary judgment motion on Counts I, IV, V, and VI, which the trial court granted. Later, defendant filed a similar motion concerning Count III. Apparently the trial court granted this motion in chambers while off the record. Although a ruling on the motion was not included in the original judgment, it is sustained in the corrected judgment.

The remaining count, Count II, went to trial. Trial began on December 5, 1996 and concluded on December 16. The trial court granted the parties several days to submit proposed findings, conclusions, and judgment. On December 23, 1996, the trial court signed the 40–page proposed findings, conclusions, and judgment defendant's attorney submitted.

On January 21, 1997, plaintiffs filed a Motion to Amend or Modify Judgment or, in the Alternative, for New Trial. Defendant filed a response, acknowledging that a corrected judgment should be entered to correct and make the judgment final. Defendant submitted a proposed corrected judgment, which the trial court signed.

## II.  Motion to Strike Portions of Supplemental Legal File

Before addressing the points on appeal, we consider plaintiffs' motion to strike portions of the supplemental legal file and defendant's brief.

█  Plaintiffs first ask that we strike Document No. 36, "Claim By Boat Leveler Company and Kercheval Industries Corporation." Although this document was part of the trial court's file in the probate case, it was not offered into evidence during the trial of Count II. Exhibits not offered at trial are not properly part of the record on appeal. *Syd-*

*nor v. Dir. of Revenue,* 876 S.W.2d 627, 629 (Mo.App. W.D.1994). We grant the motion and strike Document No. 36.

Next, plaintiffs ask that we strike the original and first three amended petitions. They contend these are abandoned pleadings which were also not offered to the trial court. Rule 81.12(b) states that the record on appeal "shall not set forth any abandoned pleadings or abandoned part of the record not introduced into evidence." Although defendant argues the "abandoned pleadings" were relied on as evidence in conjunction with the summary judgment motions, our review of the record reveals only the Second Amended Petition was received in evidence. Therefore, we strike the original, First Amended, and Third Amended petitions.

Next, plaintiffs ask that we strike an appendix to defendant's brief. The appendix is a copy of the trial court's final judgment which defendant annotated with references to exhibits and transcript pages. Plaintiffs argue that the document was not before the trial court and therefore its inclusion violates this district's Rule 365 pertaining to Appendix to Briefs.

Technically, the annotation is not within the purview of that rule and was inappropriately designated. However, defendant references the annotation in a footnote in the argument section of her brief where she argues that the trial court's judgment is supported by substantial evidence. The annotation, or selected edited portions thereof, would be more appropriately included in that section of the brief. Although the annotation is misplaced in the brief, we deny plaintiffs' motion to strike it and will consider the annotation as part of defendant's argument.

Finally, plaintiffs ask that we strike defendant's statement of facts for being in violation of Rule 84.04(c) and (h). They contend the statement is neither fair nor concise and contains argument.

We first note that Rule 84.04(c) is not applicable to defendant's brief. Rule 84.04(a) through (e) pertains to what an appellant's brief should contain and imposes requirements on that brief. Here, defendant is the

respondent and therefore is not subject to Rule 84.04(c).

Rather, Rule 84.04(f) pertains to briefs of respondents. It provides that a respondent's brief "may adopt the statement of facts of the appellant or, if not satisfied therewith, respondent shall, in a concise statement, correct any errors therein." Unfortunately, defendant's brief does neither. Instead, it contains a 30-page statement of facts. However, plaintiffs did not raise this rule violation, and we decline to strike the statement of facts sua sponte.

Plaintiffs do argue that defendant's brief violates Rule 84.04(h). That rule requires all statements of fact and argument to have "specific page references to the legal file or the transcript."

Here, some of defendant's statements of fact do not comply with the dictates of the rule. However, generally they are in compliance and we deny this portion of plaintiffs' motion.

### III. Defendant's Proposed Findings of Fact

█ Plaintiffs' first point alleges the trial court erred in "first adopting [defendant's] original proposed findings of fact, conclusions of law and judgment, verbatim, and then by adopting [defendant's] proposed corrected" version verbatim. They contend they were "robbed" of their "constitutional right of having an independent judicial determination" made of their case.

Defendant does not contest that the trial court adopted her proposals verbatim. Rather, she argues that the adoption of such proposals is not per se reversible error.

The verbatim adoption is routinely criticized. This court has said it is "unwise," *E.L.S. v. F.M.S.,* 829 S.W.2d 19, 21 (Mo.App. E.D.1992), and is of "doubtful utility," *Binkley v. Binkley,* 725 S.W.2d 910, 911 n. 2 (Mo.App. E.D.1987). The supreme court has called verbatim adoption of "significant portions of a proposed order" a "troublesome practice." *Massman Const. Co. v. Missouri Highway & Transp. Com'n,* 914 S.W.2d 801, 804 (Mo.banc 1996). Further, the supreme court stated in *State v. Griffin,* 848 S.W.2d 464, 471 (Mo.banc 1993):

For obvious reasons, when a court adopts in its entirety the proposed findings of fact and conclusions of law of one of the parties, there may be a problem with the appearance. The judiciary is not and should not be a rubber-stamp for anyone.

In the case before us, the problem with the appearance is enhanced. Here, the trial court, within a few days after receiving the proposals, uncritically adopted verbatim 111 numbered paragraphs comprising 40 pages of findings of fact, conclusions of law, and judgment. As this court stated in *Binkley*, even "the most conscientious advocate cannot reasonably be expected to prepare a document which would reflect precisely the trial court's view of the evidence." *Binkley*, 725 S.W.2d at 911 n. 2.

Moreover, when plaintiffs brought to the trial court's attention errors in those findings, conclusions, and judgment, the trial court thereafter adopted verbatim defendant's amended 40–page proposal. This creates even more of an "appearance" problem. We echo the words of the supreme court, "[t]rial judges are well advised to approach a party's proposed order with the sharp eye of a skeptic and the sharp pencil of an editor." *Massman*, 914 S.W.2d at 804. The preferable practice is for the trial court to receive proposals from the parties and then prepare its own specific findings of fact, conclusions of law, and judgment.

Nevertheless, Rule 73.01(b) and *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976) constrain our review. Thus, this court has held that the verbatim adoption of a party's proposed findings of facts and conclusions of law is not per se erroneous. *Ulreich v. Kreutz*, 876 S.W.2d 726, 728 (Mo.App. E.D.1994); *see also Stelling v. Stelling*, 769 S.W.2d 450, 452 (Mo.App. W.D.1989).

We have carefully examined the record. We cannot say that there is no substantial evidence to support the Corrected Findings of Fact, Conclusions of Law, and Final Judgment, or that the judgment is against the weight of the evidence. Therefore, plaintiffs' first point is denied.

**3.** All statutory references are to 1994.

## IV. Contract to Make a Will

We next consider plaintiffs' second and third points, both of which allege that the trial court erred in granting summary judgment on Count I concerning the agreement to make a will. In their second point, they contend the trial court misapplied section 474.155 RSMo [3] by holding the operative date as the "date of making the will rather than the date of the making of the contract to make a will." Further, they allege there were genuine and material issues of fact in dispute.

■ In their third point, they contend section 474.155 RSMo did not become effective until January 1, 1981. Therefore, they claim the trial court erred in applying that statute to the oral agreement because it was made in April of 1979, before the effective date of the statute. We address this point first.

Section 474.155 provides:

A contract [1] to make a will or devise, [2] to revoke or not to revoke a will or devise, or [3] to die intestate, if executed after January 1, 1981, can be established only by

(1) Provisions of a will stating material provisions of the contract;

(2) An express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or

(3) A writing signed by the decedent evidencing the contract.

(brackets and numbers in brackets added).

In granting summary judgment, the trial court found that this statute applied to mother's will "since it was executed after January 1, 1981. *L.G. v. F.G.H.*, 729 S.W.2d 634, 640 (Mo.App.1987)." Plaintiffs disagree with that finding, arguing that the trial court misconstrued the statute.

If one eliminates the three bracketed phrases of the statute, it would read, "A contract, if executed after January 1, 1981, can be established only by ...." Thus, whether the date of the contract is before or after January 1, 1981 determines the applicability of this statute, not the date of the will. Here, plaintiffs' summary judgment facts are

sufficient, if believed by the fact finder, to prove that an oral agreement to make a will was entered into in 1979 between mother and the sisters.

■ As indicated, the trial court referenced *L.G.* in its judgment. *L.G.* is not controlling for several reasons. In *L.G.*, one judge wrote the opinion and another concurred only in the result, while the third judge dissented. *L.G.*, 729 S.W.2d at 640. In such a situation, "it is authority solely as to result." *Wilcox v. Coons*, 359 Mo. 52, 220 S.W.2d 15, 20 (1949); *see also Musgraves v. National Dairy Products Corp.*, 400 S.W.2d 93, 96 (Mo.Div.1 1966) (such an opinion is "not authoritative except as to the result reached therein"); *Gage v. Morse*, 933 S.W.2d 410, 428 (Mo.App. S.D.1996). Thus, individual statements within the opinion have no authoritative value.

Also, in that case, the alleged oral contract to change an existing will and the will itself both predated January 1, 1981. Thus, although the *L.G.* opinion states that section 474.155 "changed the substantive law for any will executed after January 1, 1981," such a statement would be dicta. Here, the alleged contract was entered into before 1981. The trial court erred in holding that section 474.155 applies to the alleged contract and will.

■ We turn now to plaintiffs' second point, that genuine and material facts in dispute preclude summary judgment. The disputed fact concerns when mother and sisters entered into the alleged agreement to make a will.

In Count I of the Second Amended Petition filed in November 1993, plaintiffs allege the agreement to make a will. Nothing in that count indicates the date of the agreement. Thereafter, defendant propounded interrogatories to plaintiffs. Defendant asked them to state "the date on which you contend the agreement" was made. In June 1994, they responded that the exact date was unknown, but was "a short time prior to the signing of the consent." The consent they referred to was signed in the fall of 1984.

However, in March 1995, they withdrew that answer and filed a substitute answer to that interrogatory. In the substitute answer, they said that the agreement was entered into shortly after father's death on April 22, 1979. Thereafter, in October 1995, plaintiffs filed a Fourth Amended Petition. In Count I of that petition, they alleged that the agreement was made in 1979, shortly after father's death.

The trial court granted summary judgment in August 1996. In the conclusions of law section of its judgment, the trial court held that the plaintiffs "gave inconsistent testimony concerning the events at issue." It then declared that they "may not avoid summary judgment by asserting that the inconsistencies create a genuine issue of material fact; the version of the events which supports entry of summary judgment against that party may be relied on by the Court. *ITT Commercial Finance v. Mid–America Marine Supply Corp.*, 854 S.W.2d [371] at 388[39] [(Mo.1993)]."

Although the *ITT* opinion says something similar to what the trial court held at headnote [39], language before and after that sentence explains the basis for its subsequent holding. The court noted that (1) the guarantor acknowledged in his deposition that the signature on the guaranty "appears to be my signature," (2) his affidavit in opposition to the summary judgment was silent on the genuineness of that guaranty, and (3) the guarantor's handwriting expert said the signature was genuine and was his. Further, the guarantor held out that signature as valid in trying to establish that another signature was a forgery. In that context, the court said that he could not "point to deposition testimony in which he 'doubts' that the January 28 signature is his and call it a 'genuine issue' of fact." *ITT*, 854 S.W.2d at 388. This holding is consistent with the supreme court's holding two months earlier in *Martin v. City of Washington*, 848 S.W.2d 487, 492 (Mo.banc 1993). There, the court said that mere "doubt and speculation do not create a genuine issue of material fact." *Id.*

■ However, nothing in *ITT* suggests that it intended to overrule a long standing rule. That rule provides that on a summary judgment motion, "neither the trial court nor

we are authorized to determine the credibility of statements or testimony made under oath." *Fenberg v. Goggin,* 800 S.W.2d 132, 134 (Mo.App. E.D.1990); *see also Pruitt v. Farmers Ins. Co.,* 950 S.W.2d 659, 665 (Mo. App. S.D.1997). Rather, such matters are for determination upon a complete trial. *Pruitt,* 950 S.W.2d at 665.

■ Here, the trial court relied on the abandoned second amended petition and the original answer to interrogatory to create a "version of the events which supports entry of summary judgment." An admission "in an abandoned pleading is not conclusive as to the fact alleged, and does not constitute a judicial admission." *Evans v. Eno,* 903 S.W.2d 258, 260 (Mo.App. W.D.1995). Nor is an original interrogatory answer conclusively binding. If it were conclusively binding, a party in an automobile collision case answering that the adversary had the green light who later said it was a mistake and the opposite was true would be bound by and unable to correct the allegedly mistaken answer. We do not know of any such rule. Rather, cases hold that the original answer may be received in evidence as an admission to be considered with all other evidence by the fact finder. *See Matter of Estate of Mitchell,* 610 S.W.2d 681, 689–90 (Mo.App. E.D.1980); *Hammer v. Waterhouse,* 895 S.W.2d 95, 101 (Mo.App. W.D.1995) ("superseded interrogatory answers could not be used as binding judicial admissions, but could at most be used as admissions against interest"). We grant plaintiffs' points two and three.

## V. Partnership Agreement

■ In plaintiffs' fourth point, they allege trial court error in finding "there was no legally enforceable partnership agreement among the plaintiffs and defendant." They contend the evidence presented establishes that "(1) the parties intended to create a partnership; (2) the essential elements of a partnership were established; and (3) the partnership had a valid purpose." The only evidence of a possible partnership was the testimony of plaintiffs and plaintiff Nancy's husband Bill. On the other hand, defendant denied making any partnership agreement with plaintiffs. When conflicting evidence or credibility of witnesses is involved, this court defers to the trial court. *Effinger v. Effinger,* 913 S.W.2d 909, 912 (Mo.App. E.D.1996).

Here, the trial court found the evidence of the oral partnership was insufficient to meet plaintiffs' burden of proof that a legally enforceable partnership agreement existed. Sufficient evidence supports that finding. Point denied.

## VI. Undue Influence

■ In their final point, plaintiffs allege the trial court's finding that there "was no undue influence exercised by [defendant on mother], and therefore no constructive trust to be imposed upon the assets left in [defendant's] control, is against the weight of the evidence." They contend the evidence established that defendant consistently exerted domination and influence over mother.

As with the previous point, at best the evidence conflicted. The trial court found that neither defendant nor her husband "exercised undue influence" over mother in any matter. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.banc 1976) directs us to set aside a judgment on the ground that it is "against the weight of the evidence" only when we have a firm belief that the judgment is wrong. We do not have such a belief and deny plaintiffs' point.

The trial court's judgment on Count II is affirmed. However, its grant of summary judgment on Count I is reversed and the cause is remanded.

PUDLOWSKI and GARY M. GAERTNER, JJ., concur.